## THE TIJUCA (two cases).

(District Court, E. D. New York. January 3, 1918.)

1. SALVAGE ⊙➔19—CLAIMS—RIGHT OF SALVORS.
    Where fire on bulkhead and piers, on which large quantities of war munitions were awaiting transportation, endangered a vessel lying beside the pier, a tug which moved the vessel to a berth across the channel, and then, it being found she was still in great danger from not only the explosion of shrapnel and bombs, but of swinging across the channel, removed the vessel to a place of comparative safety, such tug is alone entitled to compensation as a salvor against other tugs, which thereafter moved the vessel from the anchorage, at which it had been left and where it was subject to some danger, to an anchorage of absolute safety.

2. SALVAGE ⊙➔38—AMOUNT—APPORTIONMENT AMONG SALVORS.
    A steamship was lying bow in on the westerly side of a pier at the time of an explosion of war munitions awaiting transportation. During the morning she was taken from the pier to a berth across the channel about abreast of the pier. The anchorage was in such a spot that the

⊙➔For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

vessel was in danger of swinging into the slips between the pier from which she had been removed and another adjacent pier. The danger was great, owing to the frequent explosion of bombs and shrapnel, and the conduct of the tug, which alone claimed salvage for moving the vessel from the two dangerous berths, was most courageous; the services being extraordinary. *Held,* that $30,000 deposited by consent of the parties for salvage claims should be awarded, $12,500 to the owner of the tug, $12,500 to the crew, including the captain, and $5,000 to the captain individually.

In Admiralty. Libels by Edward M. Timmins, David Roche, James Kennedy, and others against the steamship Tijuca, together with libels by Frederick Bouchard and others against the same vessel. Decree for Frederick Bouchard and others.

Foley & Martin, of New York City, for libelant Bouchard.

Burlingham, Montgomery & Beecher, of New York City (Chauncey I. Clark and Geo. W. P. Whip, both of New York City, of counsel), for Pilot Roche, tugs Mutual, Kennedy, and Hercules, and their masters and crews.

MANTON, District Judge. On July 30th last, at 1 a. m., a fire broke out on the bulkhead and piers at Black Tom, Jersey City, and at about 2 a. m. an explosion occurred, resulting in disastrous loss to property in the immediate vicinity and far removed from the scene of the explosion. At the time there were bombs and shrapnel awaiting transportation to the scenes of the great war. Extensive damage was sustained by adjacent buildings, and water craft of various kinds in close proximity were ignited by the explosion and sustained serious losses by reason of the fire. Railroad cars in close proximity were destroyed or badly damaged.

The steamship Tijuca, an ocean-going vessel of 4,801 tons gross, 3,066 net registered, 375 feet long, 46.2 beam, 27.5 feet depth of hold, was lying bow in on the westerly side of Pier 6, Black Tom, at the time of the explosion. During the morning she was taken from the pier to a berth across the channel and about abreast of Pier 6. She was anchored on this side of the channel, after having been removed from the piers where the most dangerous part of the fire was, and where frequent explosions of bombs and shrapnel were continuing to occur. The tug C. Gallagher then made fast to her stern and towed her to a berth off Pier 7, which has been referred to as the "Borax" pier. The exact position in which she was placed in this berth is seriously disputed by the litigants. However, after this, the tugs Mutual, Emma J. Kennedy, and Hercules, together with Pilot Roche, took her from this position, claimed to be a dangerous and unsafe anchorage, to a concededly safe anchorage at Bay Ridge. The Gallagher, Capt. Bouchard, and the tugs Mutual, Kennedy, and Hercules, have each filed libels against the Tijuca, claiming salvage. By agreement of all parties $30,000 has been deposited in court for the services rendered the Tijuca, and the contest is over the division of this fund for such services as may appear to have been rendered.

[1] Unless the evidence satisfactorily shows that the vessel was unsafe, and in danger of being struck by bursting bombs or flying

shrapnel, or other missiles, while she lay off the "Borax" dock, the services rendered by Pilot Roche and the masters, owners, and crews of the tugs Mutual, Kennedy, and Hercules should not be compensated out of this fund. That the master and crew of the Gallagher were rendering efficient and heroic services under most dangerous and trying circumstances cannot be disputed. If she did not take this vessel from her berth at Pier 6, as claimed by her master, she did assist, and appears here as the sole claimant for such services, and all the services rendered to the Tijuca, until she was placed at anchorage off the "Borax" pier. Unquestionably, this was the most efficient service rendered to the vessel—an accomplishment fraught with danger, but resulting in the saving of the vessel from total loss. Her heroic services have been recognized heretofore in her claim against the Congress by Judge Veeder, and by Judge Chatfield in her claim against the Elzey. (D. C.) 242 Fed. 318. It is the claim of the Gallagher that the claims of the tugs Mutual, Kennedy, and Hercules are not well founded, and that the services rendered were unnecessary for the safety of the vessel and that these tugs should not participate in the distribution of this fund.

The Tijuca was hauled out of the pier at about 3:30 a. m., and anchored at about 6:10 a. m. There was a fire aboard, but it was extinguished. She was anchored on the opposite side of the channel, and it is claimed by the Mutual that she was at a safe anchorage there; but I am of the opinion that her safety there depended entirely upon the tugs remaining alongside of her, for there was danger of her being swept over against Pier 6. Her anchors were at the bow and this would not keep her stern away from the pier, or at least from swinging across the channel and partly in between the slips of Piers 6 and 7. Therefore the Gallagher was justified in seeking another anchorage for her. The testimony further indicates that at the time the Gallagher went to the rescue of the vessel, two heavy explosions had occurred with the likelihood of similar explosions occurring shortly thereafter. The Gallagher's work and that of the other tugs which assisted in extinguishing the fire was, indeed, the greatest service and the most beneficial rendered to the vessel. She was ablaze amidships, and brought to a position where the fire could be successfully fought with fire apparatus, and the Gallagher was the most helpful and took the greatest chances in this service. It was while she lay at anchorage off "Borax" pier from 6 a. m. until 8:15 a. m. that Pilot Roche and the Mutual, Kennedy, and Hercules started for the first time to render assistance to her.

The claim is made that at this time, although she was lying in high water, she was within 60 or 70 feet of the pier, and the claim is that there was likelihood that she might strike the pier or in some way ground upon the rocks. The evidence of her being hit by exploding bombs while resting at this anchorage is not clear or satisfactory, although, of course, there was some danger of shrapnel and other missiles flying this distance. Fire Chief Worth, Capt. Lyons, of the New York City Fire Department, Gully, Goss, Reilly, Hudson, and Phillips, who were at the scene on various boats, all testified that she

could not strike the docks, and, indeed, some of these witnesses navigated in and around between the dock in a steamer, indicating that there was ample room. They, too, testified that there were no missiles or explosives flying in the direction of the steamer. Then, too, there were a number of other tugs in close proximity to the Tijuca, which did not go to her aid, as they would likely have done had she been in immediate danger. But the claim has been made that there was danger of floating barges, that might be on fire, striking the vessel or in some way causing a fire upon the Tijuca. But the testimony is that after 7 o'clock there were no floating barges in the vicinity.

I do not think the vessel was on fire, as Roche testified, at the time he took charge of her. If it was, it is not shown what efforts or means were pursued to extinguish the fire. The libel filed in behalf of the Mutual, Kennedy, and Hercules stated that bombs and shrapnel were continually flying about her and the steamer was on fire and burning badly, and that the master requested the removal of the steamer to another anchorage, and that pursuant to this request the libelants helped and got up steam on the donkey boiler. The steamship was in flames, a lifeboat had already been launched from the steamship's port side, and the master and crew had loaded their personal effects, together with the ship's dog, into the lifeboat, and were prepared to abandon the ship. The believable testimony in the record does not substantiate these claims, and, indeed, at the trial the effort was made to fix liability upon the ground of the dangerous position of the vessel by reason of the change of tide and wind and her close proximity to the piers. Roche testified that in conversation with the commander, the following occurred: "Q. Is your anchor up? A. In a half an hour." This does not indicate any thought on the part of the commander of immediate danger, nor is it such an answer as would be likely with a vessel on fire.

Motion pictures were taken by an alert independent motion picture concern, which were exhibited in court, thus granting an opportunity of seeing what occurred. They were taken at a time between daylight and before Roche is alleged to have rendered service to the vessel, and consequently do not show what he did; but they do show, however, that while there was a severe fire on the piers, and the result of fire to the Walcott, they do not indicate any flying missiles or shrapnel which might endanger this vessel, and they do indicate that the danger had passed at a time prior to the arrival of Pilot Roche and his assisting tugs.

I therefore am of the opinion that the services rendered by Pilot Roche and his assistant tugs are not such as should be rewarded on the theory of services for salvage. Whatever arrangements the Gallagher made or had with assisting tugs in taking the vessel out of Pier 6 is a matter I have no concern with now, but saving the vessel was due to the efficient service in bringing and hauling her from Pier 6 and placing her at the anchorage, where she was picked up and towed away by Pilot Roche and his assisting tugs. It is for these services that salvage allowance should be made.

[2] The libelant may have a decree awarding $30,000 to the master, crew, and owners of the tug Gallagher, of which $12,500 may go to the owners of the Gallagher, $12,500 to the crew,. including the captain, and $5,000 to the captain individually. .