## THE FORDENSKJOLD.

### THE TAGGERT BROTHERS.

(District Court, S. D. Florida. May 20, 1918.)

1. **Salvage** ⊂30—Compensation—Salving Stranded Steamship.

A tug, which at the second trial on the next high tide floated a steamship worth, with her cargo, $1,000,000, which was stranded off the Florida coast at a dangerous season, although the weather was fair, the work being efficiently done, *held* entitled to an award of $40,000.

2. **Salvage** ⊂26—Elements of Award.

A tug, which anchored her two barges while salving a stranded steamship, and then proceeded alone to a port and remained two days while trying to adjust the salvage, *held* not entitled to recover for damage subsequently suffered by the barges, consequent upon the delay.

In Admiralty. Suit for salvage by Thomas S. Davis and others, owners of the tug Taggert Brothers, against the Norwegian steamship Fordenskjold and cargo. Decree for libelants.

W. Hunt Harris, of Key West, Fla., for libelants.
G. Bowne Patterson, of Key West, Fla., for respondent.

CALL, District Judge. [1] The Fordenskjold, a Norwegian steamer, left the port of Newport News October 22, 1917, loaded with approximately 5,500 tons of coal, bound for Havana. On the evening of October 26 about 5:30 o'clock, she grounded some 14 miles south of Hillsborough Light, on the Florida coast. The American tug Taggert Brothers, bound from Brunswick to Havana, with two barges, Louis H., and Martha T., having encountered heavy weather, and running short of coal, had anchored the Louis H. in the bight south of Cape Canaveral and the Martha T. opposite Palm Beach, and gone into Miami to get coal. On October 27 a fishing boat notified the captain of the tug that the steamer was ashore and the captain had sent him for assistance. There was another tug, the Resolute, in the harbor of Miami, but she declined to go to the assistance of the stranded ship. Thereupon the Taggert Brothers, after receiving her coal, proceeded to the ship and offered to assist, arriving there between 7 and 8 o'clock in the evening, and offering to assist in floating the steamer. This offer was accepted, and upon being informed that the tide was out, and nothing could be

---

⊂For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

253 F.—18

done until high water, the tug lay alongside until next morning, when at high water a hawser was passed to the ship and made fast to the stern bitts, and the tug pulled for something like three hours or more, but could not float her. The only effect was to swing the stern of the ship from west to east; the ship being aground at high water at about hatch No. 2, forward of amidships. About 8 o'clock in the morning of the 28th, the tug, with the consent of the captain of the ship, left to pick up her barges, promising to return for the high water next morning. Finding he could not pick up both barges and return for the morning tide, the tug picked up the Martha T. and returned the morning of the 29th at about 3 o'clock, anchoring the Martha T. a short distance from the ship, and again passed his hawser over the stern of the ship and began to pull, and the ship came off the shoal stern first; the hawser was then passed to the bow and made fast to the forward bitts, and the bow pulled around. After the ship was floated, she grounded again, and was again pulled off, and finally towed into deep water, where the mate of the tug was put aboard and she proceeded to Key West. The tug then picked up the Martha T. and anchored her near Cape Florida, and proceeded herself to Miami.

When the ship first grounded a 2,000-pound anchor was run out about 80 fathoms from the port bow. The officers of the ship claim that the ship first grounded on the 26th at the stern, and by the use of this anchor and the ship's engines she was floated at high tide on the morning of the 27th and took the shore again. However this may be, there is no question that at the time she took the ground the first time she was proceeding at full speed, and that there was deep water to the east of the reef on which it is claimed she first grounded. The claim that she took the ground so gradually and slowly that one did not realize it, in the light of these admitted facts, seems, to say the least, highly improbable.

There is a sharp conflict between the testimony of the libelants and claimant of what occurred. Taking all the testimony, it seems to me that the situation was about as follows: The ship was ashore upon an inner reef, there being sufficient water between to float the ship and a channel through the outer reef to deep water. There was only some 250 feet between the two, and the ship from her position did not have steering room to make this channel, had she been able to float herself by jettisoning her cargo and using her engines. There can be no question that any ship ashore on the Florida Reefs, exposed as this one was to the full force of the sea during the months of September and October, is in great peril. It is true that during the operations the weather was fine and the seas light, so light that the tug could lay alongside the ship; but nevertheless the position of the ship was one of extreme peril, and it is proper that the court should consider this in arriving at a proper award of salvage. The assistance was promptly and efficiently rendered, and without assistance I am satisfied that she would have been unable to extricate herself. She was ashore from the evening of the 26th to the morning of the 29th, and no effective assistance tendered, except that of this tug; and going to show that she

was hard aground is the condition of her plates and the repairs made necessary by this accident.

Stress was laid on the fact that the tug left the ship for about 19 hours to go for the barges, thereby abandoning the ship; but this was done with the consent of the captain of the ship and with the promise to return the next morning, and the tug did return in time for the morning high water, at which time the ship was floated. Testimony was taken of the value of the ship and cargo, and, taking the lowest of these valuations, the value of the property saved was at least $1,000,-000; the value of the cargo being about $55,000, and that of the ship $945,000. The value of the tug may be stated at $85,000.

As has been said in numerous cases, salvage is a reward for meritorious service in saving property in peril from the sea, which might otherwise be lost, and is allowed as an encouragement to persons to bestow their utmost endeavors to save vessels and cargoes in peril. The peril from which the salved property is saved is to be considered, as well as the labor bestowed, time consumed, etc. There were no elements of heroism or danger to life in the instant case. The only danger to the tug was such as was incident to going to the ship ashore, which in this case was slight, and no damage was suffered, except such as was incidental to pulling on the tug's hawser.

[2] It is contended that damages suffered by the barges, Louis H. and Martha T. should be compensated for out of the salved property, as being a part of the fleet, as well as the loss of another barge, whose trip was delayed. But all these damages occurred subsequent to the completion of the salving operations, and days after the salved property had reached the port of Key West. Had the tug returned to the Louis H. after the ship was floated and started to Key West with a representative of the salvors on board, it is entirely probable that the damages suffered by the barges would not have occurred. But the tug lay in the harbor of Miami for more than two days, awaiting the return of the captain from Key West, where he had gone to adjust the salvage claim. It does not seem to me that damages suffered by the barges by reason of weather blowing up after this delay should be compensated for by the salved property. The choice lay with the officers of the tug whether it was more important to take care of the barges than settle the salvage claim, and they made the choice, and the damage resulting therefrom must remain where it had fallen.

Guided by the rules stated above announced by many courts, I am of opinion that in this case the sum of $40,000 is a proper allowance in this case, to be paid proportionately by the vessel and cargo, according to the values as found above; this amount to be divided, two-thirds to the owners of the tug, and one-third distributed among the crew in proportion to the wages of each.

It will be so decreed.