### THE PORTUGAL.

#### (District Court, S. D. Florida. May 29, 1918.)

1. SALVAGE ☞34—AWARD—AMOUNT.
    Where a bark stranded on a Florida reef, from whence it was towed by a large tank steamer worth about $300,000, *held* that, in view of the service and the imminent danger to the bark, which was found to be worth approximately $90,000, carrying a cargo worth about $45,000, the steamer was entitled to an award of $30,000 as salvage, and to a further award of $2,000 for injury to its cables.

2. SALVAGE ☞52—LIBEL—INTERVENTION.
    Where libel was filed for and on behalf of a ship, its owners, and crew, seeking to recover salvage, and members of the crew intervened unnecessarily *held*, that they should bear the costs of the intervention.

3. SALVAGE ☞52—COSTS—STIPULATION.
    The claimant of a vessel libeled for salvage service must pay the cost of the stipulation required before the property could be released, even though it was excessive.

In Admiralty. Libel by the Gulf Refining Company against the bark Portugal, in which certain members of the crew of the steamship Gulf of Mexico intervened. Decree for libelant.

Patterson & Harris, of Key West, Fla., for libelant.

George W. Allen and W. Hunt Harris, both of Key West, Fla., for respondent.

Marks, Marks & Holt, of Jacksonville, Fla., for interveners.

CALL, District Judge. On the morning of August 8, 1917, the Portuguese bark Portugal went ashore on Crocker's Reef. This bark was of 1,353.45 gross tons and 1,223.94 net tons, built of steel, in the year 1889, and was bound on a voyage from New Orleans to Lisbon, Portugal, loaded with 128,100 oak staves. The invoice price of this cargo at New Orleans was $39,767.50.

[1] At about 1 o'clock p. m. of that day the steamship Gulf of Mexico, on her maiden voyage to Port Arthur, Tex., in water ballast, sighted the stranded bark and went to her assistance. The steamship was a tanker, built of steel, of 7,807 gross tons and 4,867 net tons, with engines developing in the neighborhood of 3,000 horse power. At

about 5 o'clock p. m. a new 9-inch manilla hawser was made fast to the bark's foremast, and the ship commenced to pull. This pulling continued for some hours, until the hawser parted. A new steel cable, 1¾ inch in diameter, was then passed aboard the bark through the stern chocks, and made fast to the mizzenmast, and again the steamship pulled without freeing the bark. A hawser was then run to' the other quarter of the stern and made fast to the mizzenmast of the bark and the steamship by the use of her engines and steam winch acting on her anchor, pulling on the two lines, succeeded about 1 p. m., of August 9th, in floating the bark. She thereupon proceeded to Key West with the bark in tow, arriving in the harbor and anchoring the bark about 7:30 p. m. of August 10th.

During the time the ship was pulling on the bark the stern chock carried away, and the after railing, stern bitts, and the mizzen rigging were destroyed. The steamship's hawsers and cable were broken in one instance, and the rest strained and strands broken in the same. The evidence shows the original value of these hawsers and cable to have been $3,250. There is no proof of the value of same in the condition they were after the salvage service had been rendered. The value of the Gulf of Mexico may be reasonably fixed at $300,000. The value of the bark, after she had been saved, was fixed by appraisers at $60,000, and the value of her cargo at $30,000. I find some difficulty in arriving at the value of the bark. The testimony of the experts taken in New York is not altogether satisfactory. It is a fact, so well known that the court can almost take judicial cognizance of it, that sailing vessels, whether of belligerent or neutral nations, bound for European ports, were denied war insurance on account of the unrestricted submarine warfare inaugurated by the Germans in February, 1917, and this fact and the danger of submarine attack upon such slow-moving craft in my opinion vitally affects the value of such craft. But this consideration did not enter into the estimates of the experts testifying in New York. Again, their testimony was based upon the dead weight carrying capacity of the sailing ship, and the evidence nowhere shows what this capacity of the Portugal was, and it varies with the model of vessel under consideration. Now the testimony shows that the Portugal was built of steel, her decks in bad condition, and her plates badly pitted on the sides and requiring renewal in a short time. I think, taking all the testimony into consideration, that a value of about $90,000 would be a fair valuation to place upon the bark.

The captain of the bark testifies that the invoice value of the cargo was more than $39,000 at New Orleans; that oak staves were more valuable in Lisbon than they were in New Orleans; so I reach the conclusion that the value of $30,000 placed by the appraisers on the cargo was too small. Again, I find myself in a quandary about reaching a conclusion as to the value of this cargo. It was certainly of a greater value on board the bark than the invoice price, but to what extent it is difficult to say. Certainly its value was not less than $45,-000. I therefore find the value of the bark and cargo is $135,000. That the bark was hard and fast aground on Crocker's Reef I think

there can be no doubt. Had she been lightly aground at the stern when the steamship made fast the first hawser to the foremast and pulled, she would certainly have been floated with little effort. Had her stern been lightly pounding with the ground swell, which was the only sea running during the salving operations, her anchor being down and holding her, I cannot imagine why she did not float when the steamship pulled on her the first time.

It was contended before me that the damage received by the bark during the salvage operations was due to bad management of the officers of the steamship, but I do not think the evidence bears out this contention. The letter written in Portuguese, and I presume intended for the Portuguese consul at New Orleans, given shortly after the operation was completed, negatives this view expressed at the hearing. Evidently it required extraordinary force to free the bark from the reef. It required the combined force of the engines and the steam winch pulling on the ship's anchor to accomplish the result.

That the service rendered was a salvage service there is no question. The question raised is whether it is a salvage service of a high or low order. That the bark was in an extremely dangerous position there can be no question. It has been said too many times by the courts that a vessel stranded on one of the Florida reefs is in imminent and great danger to admit of question. It is apparent from the testimony of all the witnesses that there was a strong current setting upon the reef, and the existence of this current made it dangerous for any ship approaching the bark to render assistance. I am therefore of opinion that this is a case where the salvage award should be generous. Now, considering the value of the steamship, the value of the salved property, the dangerous position of the bark, the dangers encountered by the steamship in the rendition of the service, the time and effort consumed, and the promptitude, manner, and success of the same, the fact that the steamship was delayed in her voyage to Port Arthur, the time consumed in the salvage service and towing the bark to Key West, I am of opinion that the amount of the award should not be less than $30,000, and in addition the amount of $2,000 for the damage to the ship's hawsers and cable.

[2, 3] There have been three interventions filed by members of the crew of the Gulf of Mexico. I fail to see the necessity of making these additional costs, in a case where the costs are already heavy. The libel was filed for and on behalf of the ship, its owners and crew. The rights of the crew were amply protected under this libel, and the filing of these interventions was unnecessary and simply result in additional unnecessary costs.

There is another matter I wish to advert to, and that is the amount of stipulation required of the claimant before the property could be released. Application was made to the court to reduce it, which the court refused to do, at the time having no light before it, except the value of the property and the amount of salvage claimed in the libel, both of which it now appears to me were excessive. The court having required the stipulation, the cost of same will have to be paid by the claimant. As regards the costs of the three interventions I

deem it nothing but equity that these costs should be borne by the interveners, and not by the claimant.

It will be decreed in this case that the libelant recover from the claimant and his sureties the sum of $30,000 as salvage and the further sum of $2,000 as damages to the hawsers and cable used in the salving operations, and the costs of the main proceeding; the amount of the salvage award to be divided between the vessel and the crew in the proportion of three-fourths to the vessel and one-fourth to the crew, to be paid to each member in proportion to the monthly wage received by him. The costs of the intervention to be taxed against the interveners and their shares in the award.

It will be so decreed.