## THE F. Q. BARSTOW.

### (District Court, D. Maryland. April 15, 1919.)

1. SALVAGE ☞48—PROCEEDINGS—EVIDENCE.

On libel on behalf of the owner of tugs which towed burning steamship from a burning pier, *held*, that the service was meritorious, and it was to the interest of the ship to be removed from the pier as soon as possible.

2. SALVAGE ☞21—AWARDS—ABANDONMENT OF VESSEL.

Where a tug removed a burning steamship from a pier that was on fire to a point of safety, *held*, that the tug should not leave it without making certain that it is secure, and where it left the ship without making the same secure and the services of another tug were necessary, the value of such service should be deducted from the salvage award in favor of the first.

3. SALVAGE ☞31—AWARDS—SERVICES.

Where a vessel which, with her cargo of naphtha, was worth $3,500,000, caught fire from a burning pier, and though the naphtha and munitions on board were liable to explode, tugs removed the vessel from the pier to a point where the fire was extinguished, *held*, that the salvors should be awarded $50,000 to be apportioned as stated between the several tugs and the owners, master, and crew.

4. SALVAGE ☞38—AWARD—DISTRIBUTION.

Whenever a sum is awarded to the master and the crew of salving vessels, it will in the absence of special circumstances, be shared among them in proportion to the wage bill.

In Admiralty. Libels by the Atlantic Transport Company and others against the steamship F. Q. Barstow. Decree for libelants for salvage awards.

George Forbes, of Baltimore, Md., and Chauncey I. Clark, of New York City, for libelant Atlantic Transport Co.

Harry N. Abercrombie, of Baltimore, Md., for libelant Baker-Whiteley Coal Co.

Marbury, Gosnell & Williams, of Baltimore, Md. (George Weems Williams, and L. Vernon Miller, both of Baltimore, Md., of counsel), for libelant Curtis Bay Towing Co.

Ritchie, Janney & Stuart, of Baltimore, Md., and Kirlin, Woolsey & Hickox, of New York City (Albert R. Stuart, of Baltimore, Md., and Mark W. Maclay, Jr., and Peyton Randolph Harris, both of New York City, of counsel), for claimant Standard Oil Co.

ROSE, District Judge. On the morning of the 22d of November last the American Tank steamship F. Q. Barstow, with a cargo of some 3,000,000 gallons of naphtha distillate, tied up to the south side of the Standard Oil Company's pier at Canton, in this harbor. Her stern projected some distance beyond the sea end of the pier. She was a large new ship, built in 1917, of upwards of 10,000 tons gross register, 500 feet long, 68 feet wide, and 35 feet deep. She was then, in her undamaged condition, worth $3,000,000, and her cargo about $500,-000. Her earned freight amounted to upwards of $22,000. The unloading of the naphtha, which had begun shortly after she made fast, had been interrupted, because the permanent pipe line through which the discharge was taking place in some way got out of order. The pier was part of a large plant maintained by the Standard Oil Company

at this point, upon which were storage tanks for oil, gasoline, naphtha, and similar inflammable products.

Between 2 and 3 o'clock in the afternoon, fire was discovered on the pier. It spread rapidly, and the bow end of the ship broke into flames before it was possible for those on board to cast off her lines. They were forced to flee for their lives, escaping, for the most part, over her starboard quarter. In order to facilitate their descent, a towing hawser was thrown lightly around one of the bits. It was quite sufficiently secured to maintain the weight of an individual or two, but not to hold under any attempt to pull the ship away from her moorings. She not only had on board a highly inflammable cargo, but her fore and aft guns were still mounted, and there were near each a few shells ready for immediate use. Directly under each of them was a magazine containing considerable supplies of ammunition.

The fire attracted the attention of all the tugs in the harbor, and nearly all made haste to the scene. When they arrived where they could take in the situation, there was on the part of nearly every one of them much more hesitation than they usually display where there is a chance to save property and earn salvage. All of them knew how dangerous was the neighborhood of a burning oil plant. They knew or suspected the character of cargo the ship had on board. Empty or partly empty gasoline drums on the pier and the shells lying near the bow gun were constantly exploding.

As the tug Curtis Bay came up from the lower harbor, it passed, bound down, the powerful tug Britannia, commanded by Capt. William Freeburger, one of the most experienced and competent tugboat masters in the harbor. He signaled that he wanted to speak to the Curtis Bay, and when the two boats came within hearing distance he told Capt. Thompson of the Curtis Bay that he had docked the Barstow that morning, and knew what she had on board, and that she was liable to explode at any time.

When Capt. Thompson reached the fire, the sights and sounds were calculated to shake an ordinarily steady nerve. Nevertheless, apparently without hesitation, he pushed his tugboat, bow on, under the port quarter of the Barstow, put up a ladder from his deck to that of the ship, upon which there at once climbed one Frank Brophy, a deck hand on the Curtis Bay, who made fast the line from the tug, looked carefully about the after part of the ship to make sure that no one was left on board, and then, and not until then, clambered back to his tug, which, having made the line from the ship fast to her stern bits, turned so as to head out. The Curtis Bay is a powerful boat. She pulled to her full capacity, but the ship held fast. The tug Elma then took a line from the Curtis Bay to her stern; next the government cutter Tioga in like manner got a line from the Elma, and in spite of this combined pulling force the ship would not come away. The situation became too alarming for those on board the Elma, and the terror of her crew was so great that the captain yielded to it all the more readily that it seems not improbable that he shared it. She cast off her lines. The connection of the Tioga was thus broken, but so soon as she could get around, she got a line on the Curtis Bay. After a while, perhaps because the progress of the fire had released the fastenings

which kept her bound to the wharf, the ship moved, and was towed out to the flats.

It is not possible to fix with accuracy the number of minutes which elapsed from the time the Curtis Bay made fast until the ship came away. Some of the estimates go as high as 50. I think, however, the probability is that they did not greatly exceed 20. There was no doubt that during this time, however long it was, every one on board the Curtis Bay felt he was in peril.

The chief engineer of the Barstow had succeeded in inducing another tug to put him upon the Curtis Bay. He was so apprehensive that the after magazine on the ship might explode that he made up his mind to try to get aboard of her, so that he could flood it. He attempted to climb up the hawser, but when he was halfway up, too late for him successfully to go on or to go back, he realized, as he testified, that it had been 20 years since he had essayed any such feat. Just at this time his danger was seen by the tug Mary P. Riehl, which, after rescuing a lighter, to be hereinafter mentioned, had returned to the scene and was looking for a chance to get a line on the Barstow. It ran in under the hawser upon which he was, and held itself in such position that he was able to drop to its deck in an exhausted condition. About this time, it in some way fouled one of the lines of the other tug, and had its flagstaff pulled away. It claims to have got its line fast to a hawser hanging over the Barstow's starboard quarter. If it did so, it must, I think, have been after the happening of the trifling accident already mentioned. According to its story, the ship came away shortly after it began pulling. If so, I cannot escape the conviction that it was a mere coincidence. I accept unreservedly the testimony of the first officer of the Barstow as to the insecure way in which the inboard end of the line in question was made fast. It follows that the part the Riehl played in moving the ship was very nearly negligible.

After the Tioga and Curtis Bay pulled the Barstow over on the flats, the Curtis Bay kept her line taut to hold the steamer in position. The tugs Mary P. Riehl, Atlantic, and International, all belonging to the Atlantic Transport Company, then came up, and from the starboard poured water on her, while the city fire boat, which had been playing upon her while still at the pier, followed her out and threw powerful streams on her port side, which, because it had been next the burning pier, was much the hotter. Men from the tugs, or some of them, got aboard the ship and assisted in putting out the smaller blazes on her. The serious work of extinguishing the dangerous fire was done by the fire boat, which threw streams many times larger and more effective than the combined force of all those of the tugs. All of them, except the Curtis Bay, were sent away at or about nightfall. Some time after dark the captain of the Barstow, who had been on his ship, wanted to go ashore to attend to some of the multifarious things which he had then to look after. He asked Capt. Thompson if the ship was fast ground, and on being assured that it was requested to be put ashore. The Curtis Bay accordingly went away with him, and while it was gone the Barstow started to drift down upon the pier ends, and had nearly come into collision with them, when the

Britannia, which had been summoned by an appealing whistle, arrived in the nick of time and pulled her out of danger.

The damage to the ship, from fire and water, amounted to $500,000; its cargo was uninjured; so that the total value of the saved property was in round figures $3,000,000.

After the fire broke out, the rescued lighter, of which mention has already been made, was lying across the end of a pier some 100 feet north of the one which burned. She had nothing on her but a few empty oil barrels. Sparks had already started a small blaze upon her, and, if it had not been speedily checked, she would have burned fiercely. As it was, the Mary P. Riehl, upon arriving on the scene, got a line on the lighter and pulled her out into the harbor, extinguished the light fire on her, and turned her over to the Riehl's sister tug, Atlantic, and by the latter she was made fast in a place of safety.

[1] The chiefs of the fire departments of New York and of Baltimore, who testified for the claimants, were doubtful, or more than doubtful, whether anything was gained by pulling the ship out into the stream. Their theory was that, with two city fire boats at the fire, the Barstow and the other property exposed were more likely to be saved if the municipal fire service did not have to divide its forces to look after the ship. They are very experienced and highly competent men. There is a good deal to say for their point of view, but, on the whole, I am convinced that it was to the interest of the ship to get her away from the burning pier as soon as possible.

[2, 3] In passing on salvage claims arising out of harbor fires, it is, of course, necessary to keep in mind that the hope of large rewards sometimes leads tugboats not only to rush in where they are not needed, but to get in the way of the municipal fire department and of each other, or to take ships where they are in more danger, or where they will expose other property to unnecessary hazard. There can be no question that it took more than ordinary courage to go and stay in the neighborhood of the burning Barstow. It is true that the claimant has put experts on the stand to explain that the chances against an explosion of the naphtha were great. Doubtless they are right, but there was at least a possibility that there might have been one. If there had been, the consequences to life and property would have been disastrous. The explosion of the ammunition in the after magazine might well have been fatal to those near her stern. How imminent this peril was to the apprehension of the chief engineer of the ship was shown by his risking his life in an effort to prevent it. After all said, what the tugboat men did not do speaks eloquently of their fears. They are a bold set. They dearly love a salvage allowance. There were perhaps a score of them near the fire. If they had not thought that death was hovering over the ship and all near it, every one of them would have striven to get a line on her, or on some other tug which had already done so. The Elma did make fast to the Curtis Bay, but those on board were so alarmed that it cast off. The Riehl went up close to the ship, but only after Capt. Donahue, the marine superintendent of the owner, who chanced to be aboard, had taken over the command from the captain, who frankly stated his unwillingness to take the risk.

It is highly probable that the faulty navigation of the Riehl, which resulted in the loss of her flagstaff and other trifling damage, was a consequence of the more or less divided command incident to Capt. Donahue's partial displacement of its master.

Capt. Thompson, of the Curtis Bay, has graphically portrayed the danger and his own indifference to it. It may be that, so far, at least, as concerns the part anybody else had in pulling the ship away, he may be more positive than he was observant. Brave men are usually both modest and accurate; but there are exceptions to the rule, as witness Cyrano, the immortal creation of the great French playwright who has recently passed away.

I am persuaded that the services rendered, and for which compensation is asked, were useful, and they were rendered with exceptional courage and all needed skill. After allowing for the fact that the Tioga, which well performed its part, is a government ship, and therefore does not ask salvage, an award of an aggregate sum of $50,000 against the Barstow, her cargo and freight, and $1,000 against the lighter, appears to be at once reasonable and adequate.

Of this, the Britannia is entitled to $1,000. What it did required simply promptness and skill, involved no danger, and took no appreciable time, but yet it was quite important. Its allowance must come out of the $36,000, which otherwise would be apportioned to the Curtis Bay. It should not have left the ship without making sure that it was secure, and, if it had not done so, the services of the Britannia would not have been required. Of the remaining $35,000, to go to the Curtis Bay, Capt. Owen A. Thompson, its master, is entitled to $3,000, in recognition of the courage, skill, and persistence shown by him. The deck hand, Frank Brophy, who climbed upon the steamer, the most perilous feat of all, is awarded $750. The remaining $31,250 will be distributed, two-thirds to the owners and one-third to the master and crew.

The Mary P. Riehl, for her services, and particularly for the part she played in saving life, is awarded $12,500. She will also receive $750 of the $1,000 charged against the lighter, or $13,250 in all. Of this Capt. William J. Donahue will get $2,000, because it was due to his courage that the Riehl participated at all. To E. F. Hepburn, who was on board and assisted, will be given $200. Two-thirds of the remaining $11,050 is awarded to the owner, the Atlantic Transport Company, and the balance, one-third, to the master and crew.

To the Atlantic is apportioned $1,000, chargeable against the ship, cargo, and freight, and the remaining $250 of the $1,000 allowed for services to the lighter. Of the $1,250 to the Atlantic, $50 will go to the master, $800 to the owner, and the remaining $400 to the master and crew.

The International is allowed, against the ship, cargo, and freight, $500, two-thirds of it to the owner, and one-third to its master and crew.

[4] Whenever a sum is awarded to master and crew, it will be shared among them in proportion to the wage bill, except that, as the captain of the Riehl declined to discharge the duties of that position, he can participate only as if his wages were those of a mate.