## ASLAKSEN v. UNITED STATES.

(District Court, N. D. Ohio, E. D.   April 23, 1921.)

No. 2707.

**Salvage ☞34—Award to master for salvage service at sea.**

Libelant, master of the steamship Lake Ellenorah, in ballast and worth $900,000, in answer to a wireless call went to the assistance of the Avondale, a vessel of the same owner, 100 miles distant in the North Atlantic, and found her wholly disabled, including her steering gear. The Avondale, with cargo, was worth nearly $2,000,000, and was then some 500 miles from St. Johns, Newfoundland, which was the nearest port. The time was November and the weather was foggy, with high winds and heavy seas, and the Avondale was in great danger of total loss. Libelant, with some dissent on the part of his officers, because the Lake Ellenorah was not equipped for such work, undertook to tow her to St. Johns, and succeeded in doing so in safety after six days, during which both vessels and crews were in considerable danger. Libelant had sole responsibility for the operation, and remained on duty almost continuously. *Held* that, but for the common ownership of the vessels, a salvage allowance to the Lake Ellenorah and crew of $100,000 would have been no more than reasonable, and that an award of $3,000 to libelant for his services was a just, though moderate, allowance.

In Admiralty. Suit by Olav Aslaksen against the United States. Decree for libelant.

Goulder, White & Garry, of Cleveland, Ohio, for libelant.

E. S. Wertz, U. S. Atty., and D. J. Needham, Asst. U. S. Atty., both of Cleveland, Ohio.

WESTENHAVER, District Judge. Libelant, master of the Lake Ellenorah, a steamship owned by the United States Shipping Board Emergency Fleet Corporation, has filed this libel to recover for salvage services rendered November 5 to 11, 1919, inclusive, to the Avondale, another steamship owned by the same corporation. The facts have been agreed in writing. That agreement is adopted by me as my findings of fact. In this memorandum, such part of the facts only will be stated as are necessary to an understanding of the questions of law to be decided.

The Lake Ellenorah was on November 5, 1919, without cargo and in ballast only, en route from Plymouth, England, to Norfolk, Va., and while in the North Atlantic Ocean, 500 miles more or less southeasterly from St. Johns, Newfoundland, picked up a wireless call for assistance from the steamship Avondale. She altered her course and steered for the location indicated in the wireless call, which proved to be about 100 miles distant. Between 7 and 8 o'clock the same evening, she came up to the Avondale, which was displaying a bright light as a guide. The Avondale was then entirely disabled, floundering and laboring in the seaway, unmanageable, without ability to navigate, and drifting at the mercy of the elements. She had been thus lying and drifting for a number of days and sending out wireless calls for help. Her machinery was so disabled that her main engine could not be used; her

engine room is described as a wreck, and the conditions were such that it was impossible to make necessary repairs or to recondition her at sea, and, as afterwards developed, was incapable of steering well when taken in tow. Her crew were also worn out. These facts and conditions were reported by the master of the Avondale to the libelant and a request made that the Lake Ellenorah tow the Avondale to some place of safety as quickly as was possible. The wind had been blowing very hard from the southeast for several days, with violent seas, and, although the wind had by now fallen, there was still running a very heavy swell, which continued for several days and until the change of weather presently to be stated. The weather also was very foggy, and this condition likewise continued off and on during the ensuing six days consumed in performing the salvage service for which compensation is now asked.

The value of the Avondale was about $1,800,000, and the value of her cargo $132,000. She was a large oil tank steamer, some 400 feet in length, 54 feet beam, 9,000 tons' carrying capacity, and drawing 28 feet of water. She was bound from the United States to Greenock, Scotland, with a cargo of oil. The Lake Ellenorah was valued at about $900,000. She was 253 feet in length, 43 feet beam, 3,000 tons' carrying capacity, and was drawing about 12 feet of water forward and 16 feet aft. She was not constructed as a towing ship, nor adapted to that service, having no appliances or towing bitts, and no place for making fast a line aft, except the regular quarter bitts on either side. The nearest safe port, from the position in the open Atlantic where the Avondale was found, is St. Johns, Newfoundland. At this season of the year and in that latitude a low barometer might be expected at any time, with heavy gales and bad weather. It is agreed that the Avondale's position was an extremely dangerous one for an unmanageable ship, and that there was continuous danger after she had been taken in tow that the tow line might part, and substantial danger of accident to either or both ships, which might set her adrift, with the possibility of meeting with even the gravest disaster.

In this situation, the libelant, after consulting his officers and not without some opposition from them to attempting the operation, determined to attempt the salvage undertaking, and so notified the master of the Avondale. The latter had no available line, but the Lake Ellenorah had a wire cable of 120 fathoms, carried for use in emergency, and this was used. After two efforts and with no little difficulty, this cable was passed to the Avondale and made fast to her, and was attached to the Lake Ellenorah by bridles made fast to the quarter bitts. This operation consumed several hours. The Lake Ellenorah then started slowly and was able to make only 4 miles an hour. The Avondale was unable to steer after her, but sheered broadly, and the strain from the plunging of the two ships was so great as to first part one of the bridles and a little later the towing cable. Thereupon it was agreed between the masters of the two ships that the Lake Ellenorah would stand by until morning and make another attempt; the master of the Avondale reporting that he had found below and would try to get up a ten-inch hawser and wire cable, each of 120 fathoms. This he suc-

ceeded in doing during the night. The Avondale ran out, by direction of the libelant, 15 fathoms of her anchor chain and attached the towing cable to it, in order to avoid chafing at that end. Two members of the crew of the Lake Ellenorah, one the first officer and the other the son of the libelant, volunteered to go, and did, in a small boat called a "dinghy," suitable for use in the seaway by two men, to pick up the cable and bring it aboard the Lake Ellenorah. This eventually was done, not without difficulty and substantial danger, and the cable was finally made fast.

The Lake Ellenorah again proceeded towards St. Johns with her tow. The Avondale in her disabled condition steered badly in the seaway, from which much difficulty was encountered during the towing. Difficulty was also experienced from the racing of the propeller wheel of the Lake Ellenorah as her stern would be lifted by the swells out of the water. Thus proceeding on an approximate northwest course for St. Johns, two days later, on the evening of November 8, the wind suddenly veered around to the northwest, blowing hard and increasing. This wind, opposed to the heavy southwest swells, caused a nasty, irregular sea, adding much to the difficulties of the undertaking and causing much anxiety aboard both ships, which were at that time in the vicinity of the dangerous Virgin Rocks, which were to be passed to the northward. The wind, sea, and currents caused the vessels to drift so seriously that on the afternoon of the 9th it was found that no headway could be made, but that the vessels were drifting and in danger of going on the Virgin Rocks in spite of every effort. A seaman on the Avondale later reported that breakers could be heard. The weather was foggy, observations had not been dependable, and exact positions could not be fixed; but the libelant determined to hold fast to the Avondale and change his course and run off more southerly with the wind abaft the beam, and thus try to get enough headway to clear the Virgin Rocks. He was also by this time able to communicate by wireless with Cape Race for confirmation concerning his position. This changed course was pursued with the wind abaft the beam until libelant could calculate that they had successfully cleared the Virgin Rocks, and he then adopted a course for Cape Race, and about 10 hours later sighted that light. The vessels arrived at St. Johns about 3:00 p. m. November 11.

During the whole period from November 5 until the afternoon of November 11, libelant had the sole responsibility for conducting the operation, with all the accompanying anxiety. The heavy sea and winds, the foggy character of the weather, and the consequently unsatisfactory observations as to his position, added to the difficulties and uncertainties of the operation. He was on deck, in active charge, almost continuously, not retiring from his post during the entire length of time, and securing only short intermittent naps in the rest room. It is agreed that the conditions prevailing, as herein noted, made the situation and services throughout the entire period hazardous, and called for judgment, courage, and skill. The salvage operation was successfully conducted, and completed without material damage in the operation to either ship.

The United States Shipping Board Emergency Fleet Corporation awarded to the master and crew of the Lake Ellenorah as full compensation for these salvage services the sum of $7,000. In apportioning this 'amount, the Board allowed the master the sum only of $1,008.78, a trifle more than the sum apportioned to the chief engineer, and only three times the amount apportioned, respectively, to the first assistant engineer and to the first officer. All of the officers and crew accepted the award in their favor except the master, who, deeming the award to him insufficient, has brought this libel.

The jurisdiction of this court to entertain this libel and determine the issue is not questioned by defendant. It is specially conferred by Act of Congress approved March 9, 1920 (41 Stat. 525). See sections 2 and 10. Nor is it disputed that the libelant is entitled to recover for salvage services, notwithstanding both ships involved in the operation are owned by a common owner. 35 Cyc. 740; Jacobson v. Panama R. R. Co. (2 C. C. A.) 266 Fed. 344. The principles upon which compensation is allowed for salvage services are well settled. See 35 Cyc. 750, 752. An authoritative and sufficient statement of these principles is made in The Blackwall, 10 Wall. 1, 19 L. Ed. 870, which, with slight changes of phraseology, are excerpted as embodying the principles controlling in this case. Salvage services are viewed by the admiralty courts, not merely as pay on the principle of quantum meruit, or as remuneration for work and labor, but as a reward given for perilous services voluntarily rendered, and as an inducement to seamen and others to embark in such undertakings to save life and property. Public policy encourages the hardy and adventurous mariner to engage in these laborious and sometimes dangerous enterprises, and, with a view to withdraw from him every temptation to embezzlement and dishonesty, the law allows him, in case he is successful, a liberal compensation. That compensation, while liberal, should not be so extravagant as to encourage the presentation of unreasonable demands.

The circumstances considered by courts of admiralty as the main ingredients in determining the amount of an award are the following: (1) The labor expended by the salvors in rendering the salvage service. (2) The promptitude, skill, and energy displayed in rendering the service and saving the property. (3) The value of the property employed by the salvors in rendering the service and the danger to which such property was exposed. (4) The risk incurred by the salvors in saving the property from the impending peril. (5) The value of the property saved. (6) The degree of danger from which the property was rescued.

In the present case, all the foregoing ingredients are present, some of them in a high degree. Every ingredient justifying a liberal award is present, with the single exception that the Avondale was not a derelict. Her situation and condition were such, however, that she would have been wholly lost to her owner, if some ship had not performed promptly and successfully the services performed by the Lake Ellenorah. An extended examination has been made of other cases most nearly parallel upon the facts to the instant case, in an effort to determine by comparison what would be first, a fair allowance for the en-

tire service; second, what would be a proper apportionment thereof between the owners of the ship thus employed and the master and crew; and, third, what would be a fair apportionment of the part allotted to the master and crew between the master and the remaining members of the crew.

Among the cases thus examined, the following may be noted as most nearly parallel on some one or another of the aspects of the instant case: The Charles Wetmore (D. C.) 51 Fed. 449; The Wellington (D. C.) 52 Fed. 605; The Lamington (2 C. C. A.) 86 Fed. 675, 30 C. C. A. 271; The St. Paul (2 C. C. A.) 86 Fed. 340, 30 C. C. A. 70; The Johnson Lighterage Co. No. 24 (D. C.) 240 Fed. 435, 444, affirmed on all pertinent points (3 C. C. A.) 248 Fed. 74, 160 C. C. A. 214; The Fordenskjold (D. C.) 253 Fed. 273; The F. Q. Barstow (D. C.) 257 Fed. 793; The Tijuca (D. C.) 247 Fed. 358; The Melderskin (D. C.) 249 Fed. 776; The Portugal (D. C.) 253 Fed. 264; The George Hawley (5 C. C. A.) 242 Fed. 473, 155 C. C. A. 249; The Avalon (9 C. C. A.) 255 Fed. 854, 167 C. C. A. 182. In addition thereto, my attention has been called to The British Peer, decided February 28, 1921, by the Admiralty Division of the British Admiralty Courts, which, in most respects, is an exact counterpart of the present case, except that the enterprise seems to have been less hazardous, but to have required a towage of 1,560 miles. Upon the question of the apportionment between the master and members of the crew, attention is also called to Kennedy's Law of Civil Salvage (2d Ed.) 174, 175.

Upon the basis outlined and illustrated by the numerous cases, a salvage award of $100,000 for the entire service performed by the Lake Ellenorah, including her master and crew, could not be regarded as excessive. In The Blackwall, an allowance of 10 per cent. of the value of the property salved was not regarded as excessive, even though the operation took but a few hours and involved relatively small hazard. In The St. Paul (2 C. C. A.) 86 Fed. 340, 30 C. C. A. 70, a salvage allowance of 6½ per cent. on the valuation of $2,000,000 of the property rescued was sustained. In The British Peer, above referred to, the salvage allowance was 5 per cent. An apportionment of this allowance as between the owners, on the one hand, and the master and crew, on the other, of two-thirds to the owner and one-third to the crew, would not be unreasonable. An allowance, therefore, to the master and crew of $33,333 would undoubtedly be sustained.

Our problem is to make an apportionment between the master and crew of their share of the salvage compensation. Kennedy's Law of Civil Salvage, 174, 175, says:

"The master of the salving ship not only takes his share in the actual work, but also has a peculiar burden of responsibility in undertaking and in conducting the salvage enterprise, and therefore, under ordinary circumstances, he is held to be entitled to receive out of the salvage reward a special recompense. The share allotted to him has often been from one-half to one-fourth of that allotted to the master and crew. In recent cases of salvage by steamers, his share has usually been one-third."

In The British Peer, one-fourth of the total was apportioned to the master and crew, and, of that fourth, one-fourth was apportioned to

the master. An examination of the American cases sustains the view thus expressed.

In the present case, the responsibility and service of the master, as compared with that of the crew, is relatively high and entitled proportionately to the most liberal allowance. In my opinion, an award to him now of $3,000 would be modest, not liberal, compensation. If a fair salvage award for the entire service had been made, and one-fourth or one-third thereof only were apportioned to the master and crew, and that portion then divided between the master and crew on a pro rata basis of wages paid, his share would exceed this sum. Any less allowance would be niggardly, and tend to thwart the public policy upon which salvage services are allowed.

A decree will be entered, finding the issues in the libelant's favor and allowing the sum of $3,000.