## HARRIS v. NEW YORK CENT. R. CO.

(District Court, D. New Jersey. March 11, 1927.)

1. Salvage ⚖═1—Order instructing tug captains to first aid owner's vessels in emergencies and then others held not to deprive captain of right to compensation for salvage service.

Owner's general order, instructing its tug captains, when engaged in emergency work in time of storms or other disasters, to first look after safety of owner's equipment, and thereafter to render aid to boats of other companies, held not to operate to deny tug captain any rewards for his salvage service, notwithstanding testimony that captain knew of agreement between owner and owner of salvaged vessel to render salvage services to each other without charge.

2. Salvage ⚖═37—$1,200 award in all, $300 to captain and crew of tug, for salvaging unmanned railroad float adrift in river held adequate.

Salvage service rendered by tug in picking up railroad's float, valued at $32,000, on stormy

day, adrift and unmanned in North River, and in towing float to pier, which was attended with little danger, *held* sufficiently compensated by salvage award of $1,200, three-fourths of which except for agreement between owners of salvaging and salvaged vessels to render salvage services without charge, would go to owners and one-fourth to captain and crew, and one-third of the one-quarter to captain of salvaging tug.

In Admiralty. Libel by Theodore Harris against the New York Central Railroad Company. Decree for libelant.

Alexander Simpson, of New York City, for libelant.

Bigham, Englar & Jones, of New York City (Charles W. Hagen, of New York City, of counsel), for respondent.

RUNYON, District Judge. Between 4 and 5 o'clock in the morning of March 11, 1924, the tug Lehigh, captained by the libelant, discovered the respondent's float, D49, unmanned and adrift, abreast of pier 7, North River. Following the float, and just as it came in contact with the Port Reading stake boat, the Lehigh picked it up, put a line aboard, and towed it to pier 17, North River. During the maneuvering, the float swung around and into the Lehigh, smashing her port guard rail in for a space of two feet. The weather was more or less stormy, with heavy winds, and constituting a "dirty night," as one of the witnesses described it. The float itself escaped without injury.

[1] While the main facts are undisputed, the respondent contends that the libel should be dismissed for the following reason:

It appears that the New York Central Railroad Company had an agreement with libelant's employer, the Lehigh Valley Railroad Company, by virtue of which the two companies were obliged to render salvage services to each other without charge; that in the course of his employment libelant was bound by the general orders and rules of his company; that general order No. 50, signed for by the libelant, bound him by its terms so long as he remained in the employ of that company; that libelant, in rendering salvage services, was but acting within the scope of his employment and rendering services to his own employer, and consequently is entitled to no return on a salvage basis.

General order No. 50 reads as follows:

"General Order No. 50.
"Tug Captains.

"When tugs are assigned to emergency work, such as shifting barges into safe berths at Bush Docks, S. I. or any other point, in cases of storms or other disasters, captains should first look after the safety of Lehigh Valley owned or chartered equipment. After this has been accomplished, should you notice boats owned by other companies lying in dangerous positions or in need of assistance, same should be rendered. The name of boats, time and assistance rendered, should be noted on log.

"Kindly be governed accordingly.
"C. M. Moore,
"Supt. of Floating Equipment.
"Jersey City, N. J. Jan. 14, 1924."

As I read general order No. 50, it appears to me to be nothing more than a direction to tug captains that, in effecting emergency work, the safety of the Lehigh Valley equipment should be their first concern; the further provision being that, "after this has been accomplished," assistance should be rendered to boats of other companies standing in need thereof. There is certainly nothing in this order which suggests anything more than the voluntary salvaging policy of the Lehigh Valley Railroad Company, with directions to captains as to the order in which such work should be done. No hint of an agreement between the Lehigh Valley and the New York Central. No indication that such rule was meant to operate as denying to a salvaging tug captain any and all rewards of such service. And in the absence of such features it becomes difficult to accord to the general rule the character claimed for it by counsel, even granting that the libelant subscribed to it when assuming his employment.

In the first place, the language employed may be described as advisory rather than mandatory. The tug boat captain is told, in effect, to finish first the job for his employer. When this job is completed, and not before, there are other things which he should do if the need therefor becomes apparent. But further than this the order is not illuminating, nor are we shown by the testimony on behalf of respondent that the libelant received more explicit instructions through any other medium regarding his duties and obligations in the premises, as witness the following during the examination of Mr. Moore, who issued general rule 50:

"Q. In addition to these typewritten general orders, did you issue any instructions to the men with regard to their duties? A. Well, pilots and captains, no; their duties so far as navigating the boats. It is, you might say, unnecessary, excepting in some cases to give them a little lecture once in a while.

"Q. Has this question of rendering serv-

ices to equipment of other railroads ever been brought to the attention of captains? A. Why, that is the general understanding; there is general orders issued on that.

"Q. Yes; that is the regulation of your road and other roads, isn't it? A. All railroads; in fact all other large companies.

\* \* \* \* \*

"Q. Yes; and the men in your employment had notice of that arrangement and knew of that? A. They all understand it.

\* \* \* \* \*

"Q. Do the men know of that? A. Yes; they know of it, every one of them."

So much for the testimony on this point; but so far as anything specific is concerned, nothing further than general order 50 is produced, and this order fails to carry conviction concerning anything outside of its own mild terms.

Again, it is difficult to believe that these contracting companies, whose patent aim is to save their own and each other's properties, would adopt a policy so completely calculated to remove incentive from tugboat captains in the doing of rescue work as would be the case were they specifically informed that no reward awaited their devotion of time and energy, their incurring of personal danger and possible death in effecting the salvage of vessels belonging to those companies with which the employer had contractual relations; the same being nothing more than incidents in their regular line of employment.

With seamen aboard a disabled vessel and in peril, the common instincts of humanity would doubtless prompt a rescuing crew to brave the elements to any extent, and with scant present thought of reward, but, in a case such as the one under consideration, stripped of the element of human danger aboard the float, the Lehigh captain's easiest course would be a failure to notice the float's predicament, and thus escape both inconvenience and possible danger.

As I view the situation, both the facts as shown by the testimony and ordinary business acumen argue against any arrangement beyond that evidenced in general order 50, and the terms of this order militate in no way against the libelant's right to claim whatever reward may be his as the result of the services rendered by the Lehigh.

Therefore, believing as I do that the respondent has failed to show satisfactorily any waiver of the libelant of his claim for salvage, either in the terms and circumstances of his hiring or otherwise, the language of Judge Benedict in The Cetewayo (D. C.) 9 F.

717, in which he deals with a somewhat similar situation, impresses me as a clear-cut presentation of the problem.

"It may, perhaps, be possible to hold that the provision in section 4535 [Rev. St., being Comp. St. § 8324] was not intended to apply in cases where a seaman, with full knowledge by an express agreement, undertakes to engage in a salvage service, and to waive any compensation therefor other than his regular wages." Page 718.

"But, however this may be, as no point has been made upon the statute by the libelants in this case, the present case may well turn upon the question of fact on which the libelants have supposed it to turn, namely, whether any agreement was ever made by the libelants by which they abandoned or waived their right to participate in the reward. \* \* \* Upon this question of fact the testimony of each libelant is that he was hired at monthly wages in the ordinary manner and that nothing whatever was at any time said by either party in regard to an abandonment or waiver of any right to claim salving; and there is no direct evidence to the contrary of this." Page 719.

"I am not prepared to say that, aside from the statute, a valid agreement might not have been made with these men which would have been a good defense to the present action, but I am quite sure that such an agreement is not proved by any evidence in this case." Page 719.

"There are abundant and obvious reasons for requiring, in cases of a defense like the present, clear proof of a plain agreement, made with due consideration for the seaman, and with full knowledge on his part, before a court of admiralty will feel justified in allowing the reward, which the maritime law gives for personal merit and upon grounds of personal policy, to be diverted from the hands of those who perform the labor to the pocket of him who owns the ship." Page 720.

Having determined that Harris is not foreclosed of any right as libelant, it becomes necessary to ascertain the extent of that right as translated into terms of dollars.

[2] From the evidence, I am of the opinion that the assistance rendered by the Lehigh, while important, of course, to the owners of the float, amounted to little more than a towing service. Had no help appeared, the float would apparently have drifted on by easy stages until it reached Ellis Island, there to come into contact with a stone wall, or become beached on the mud flats. There was no danger, it seems, in any event, that it would have

drifted out to sea. And this fact, coupled with the further condition that the attaching of the line to the float was fraught with little if any danger to anybody concerned, makes the awarding of modest compensation to libelant altogether fitting.

"Salvage services are viewed by the admiralty courts, not merely as pay on the principle of quantum meruit, or as remuneration for work and labor, but as a reward given for perilous services voluntarily rendered, and as an inducement to seamen and others to embark in such undertakings to save life and property. Public policy encourages the hardy and adventurous mariner to engage in these laborious and sometimes dangerous enterprises, and, with a view to withdraw from him every temptation to embezzlement and dishonesty, the law allows him, in case he is successful, a liberal compensation. That compensation, while liberal, should not be so extravagant as to encourage the presentation of unreasonable demands." Aslaksen v. United States (D. C.) 273 F. 241–244.

From figures submitted and not disputed, the value of the New York Central float was $32,000 and that of the Lehigh $54,000. In view of the agreement between the two companies, however, as testified to by respondent, the latter figure represents equipment voluntarily dedicated by the Lehigh Valley Railroad Company to the actual service rendered the New York Central float, and therefore should play no part in computing the total value of property subjected to possible peril, or as helping afford a basis for figuring a salvage award.

In my opinion, $1,200 would be adequate as an award to all interested parties, three-fourths of which, except for the said agreement, should go to the owners, and the remaining one-fourth to the captain and crew.

"The master of the salving ship not only takes his share in the actual work, but also has a peculiar burden or responsibility in undertaking and in conducting the salvage enterprise, and, therefore, under ordinary circumstances, he is held to be entitled to receive out of the salvage reward a special recompense. The share allotted to him has often been from one-half to one-fourth of that allotted to the master and crew. In recent cases of salvage by steamers, his share has usually been one-third." Kennedy's Law of Civil Salvage, 174, 175.

The award to the libelant in this case will be one-third of one-fourth of $1,200, or $100.

A decree to the above effect may be submitted.