THE JOHNSON LIGHTERAGE CO. NO. 24.

THE JOHNSON LIGHTERAGE CO. NO. 15.

(Circuit Court of Appeals, Third Circuit. January 3, 1918. Rehearing Denied February 8, 1918.)

No. 2281.

1. SALVAGE ⊛⟶38—SERVICES RENDERED BY CHARTERED VESSEL—RIGHT TO AWARD FOR RISK TO VESSEL.

As between charterer and owner, even when the charterer was owner pro hac vice under a demise, the determination of the question as to who is entitled to the share of salvage money awarded for the risk to the vessel depends both upon who is entitled to the vessel's services and earnings and upon whom the loss would fall if the vessel had been injured or lost in the salvage operations, and in a proper case the award may be apportioned between them.

2. SHIPPING ⊛⟶54—DEMISE BY CHARTER—LIABILITY OF CHARTERER FOR INJURY TO VESSEL.

A charterer under a time charter of demise, in the absence of provisions in the charter party to the contrary, is only responsible as bailee for hire for ordinary diligence, and is only liable for ordinary negligence in the care of the vessel.

3. SALVAGE ⊛⟶38—SERVICES RENDERED BY DEMISED VESSEL—APPORTIONMENT OF AWARD.

A time charter of a tug, which was a demise, contained no provision respecting salvage services, nor requiring redelivery of the tug in as good condition as when received, except that, in case of trips to a certain outside port, the charterer was required to procure insurances, or, if that could not be obtained, to give a bond to protect the owner from loss or damage to the boat while on such trips. The tug rendered a dangerous salvage service in New York Harbor in rescuing two scows laden with war munitions and high explosives, which had broken loose during a storm and imminently threatened the safety of other shipping. A fund was paid into court by the owners of the cargoes to compensate the salvors. *Held*, that the court, after making a satisfactory award to the

---

⊛⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

crew, properly decreed that the remainder of the available fund should be apportioned between the owner and the charterer, on the basis of risks incurred.

4. ADMIRALTY ☞121—PROCTOR'S FEES—CONTRACT BETWEEN ATTORNEY AND CLIENT.

A controversy with respect to a contract between a proctor and his client for fees cannot be litigated in the admiralty suit.

5. SALVAGE ☞52—SUITS FOR SALVAGE—COSTS.

Proctor's fees are not properly allowable as costs, to be taken out of the general fund recovered in a suit for salvage.

6. SALVAGE ☞38—APPORTIONMENT OF AWARD—SHARE OF CREW.

The fact that the captain of a tug demised to a charterer was, under his contract of hiring, entitled to a share of the charterer's part of a salvage award, *held* not to deprive him of the right to share also in the award to the crew.

Appeal from the District Court of the United States for the District of New Jersey; Thos. G. Haight, Judge.

Suit in admiralty for salvage by William J. Scanlan and others, composing the firm of W. J. Scanlan & Co., against the scow Johnson Lighterage Company No. 24 and the derrick lighter Johnson Lighterage Company No. 15 and their cargoes; the Johnson Lighterage Company, claimant, and James Shewan & Sons, Incorporated, intervening libelant. From the decree of distribution, various appeals have been taken. Modified and affirmed.

For opinion below, see 240 Fed. 435. See, also (D. C.) 231 Fed. 365.

Foley & Martin, of New York City (William J. Martin and George V. A. McCloskey, both of New York City, of counsel), for appellants.

Runyon & Autenrieth, of Jersey City, N. J. (Horace L. Cheyney and Edward W. Norris, both of New York City, of counsel), for appellee James Shewan & Sons.

E. Curtis Rouse, of New York City (Arthur L. Burchell, of New York City, of counsel), for appellee Axtell.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

WOOLLEY, Circuit Judge. These are appeals from a decree in admiralty distributing salvage to the owner, charterers, master and crew of the salving vessel and to their proctors. 240 Fed. 435. They raise, not without confusion, every phase of the conflicting claims adjudged by the decree.

On December 26, 1915, the steamtug "John A. Seeley," bound down the New York Bay, encountered a storm of unusual violence. She sighted two deck scows, flying munition cargo signals, adrift near Red Hook Flats in imminent peril of collision with steamships and other craft anchored in the course in which the wind was driving them. The master of the tug immediately changed her course and made for the scows, with full knowledge of the character of their cargoes and the danger of attempting their rescue. When she reached them they were afoul a steamer. Their position and the gale made it impossible to get a hawser to them. The tug went around the scows and nosed

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

them off with her stem until they were clear, and then, succeeding in getting a line aboard, towed them to a place of safety.

The tug was owned by the Seaboard Equipment Corporation and was under charter to W. J. Scanlan & Company. The scows were owned by Johnson Lighterage Company and were named respectively "Johnson Lighterage Company No. 24" and "Johnson Lighterage Company No. 15." The former was laden with munitions belonging to the Russian Government; the latter with munitions belonging to the French Government.

Scanlan & Company, as charterers, and Seaboard Equipment Corporation, as owner of the tug, filed libels against the scows, their cargoes and pending freight for salvage. The two governments disposed of any question of right to salvage against their property by obtaining its release from the libels upon payment into court of the respective sums of $25,000 and $6,500. Thereafter the actions were consolidated and were prosecuted against the fund.

After filing its libel, the Seaboard Equipment Corporation sold the tug "John A. Seeley," to James Shewan & Sons, Inc., and also assigned its claim for salvage, whereupon, James Shewan & Sons, Inc., was substituted as a party to the salvage proceedings.

When the pleadings were concluded, tthe claimants to the fund for salvage services, (as distinguished from claimants for professional services,) were Scanlan & Company, charterers, claiming as owners pro hac vice all the salvage excepting the crew's share and allowances for expenses and costs; James Shewan & Sons, Inc., assignee of the general owner, claiming the same fund; and lastly, the crew.

The trial court distributed the fund by two decrees, made necessary by the separate funds arising from the two scows, the substance of which taken together is as follows:

(1) That out of the fund there first be paid Foley & Martin, proctors for Scanlan & Company, charterer libellants, all taxable costs and disbursements incident to filing their libel and to the seizure and preservation of the cargoes; that there be paid E. Curtis Rouse, proctor for Seaboard Equipment Corporation, original owner libellant, his costs and fees in filing and prosecuting its libel.

(2) That there be next paid Foley & Martin, proctors for Scanlan & Company, the sum of $1,500, for their services in creating the fund now in court.

(3) That the balance then remaining be divided into three equal parts; that one part be paid Scanlan & Company, charterers of the tug; that another part be paid to and divided among the master and members of the crew of the tug in proportion to the wages they were receiving at the time of the rendition of the salvage services; and that out of the remaining part, there be paid to Silas B. Axtell, proctor for Seaboard Equipment Corporation, original owner, the sum of $1,250 proctor fee, and to Shewan & Sons, general owner, $8,000, the ascertained value of the tug, and that the balance of the third part, if any, be paid to Scanlan & Company, charterers.

Appeals were taken by one party or another upon every phase of the decree of distribution, including the master's share as a member

of the crew; but as no appeal was taken by or against the crew upon the proportion awarded the crew as a whole, the matters raised on the various appeals resolve themselves, primarily, into a contest between the owner and charterers of the tug for the whole of the remainder of the salvage fund, according secondarily, as that fund is enlarged by the disallowance or diminished by the allowance of contested claims for proctor fees.

[1] There is no dispute about the facts. The owner chartered the "bare tug" for a period of three months and surrendered her to the full possession, management, and control of the charterers without condition, except in two negligible particulars. The charter contained no reference to salvage services or to the division of salvage rewards. The service rendered the munition scows was in every respect salvage service and was performed with risk to the tug.

The boat was owned by one party and chartered by another. One was entitled to the boat and the other to her services. Both claim salvage for risks of loss in the salvage service, not by way of division between owner and charterers, however, but for the whole of the boat's share of the salvage recovered.

The charterers say that the charter was a demise of the tug, which made them owners pro hac vice, and that, being such, they are entitled to the owner's share of the salvage. The owner admits that the charter was a demise, United States v. Shea, 152 U. S. 178, 186, 14 Sup. Ct. 519, 38 L. Ed. 403; Leary v. United States, 14 Wall. 607, 610, 20 L. Ed. 756; but maintains that it is none the less the owner of the tug; that its tug was risked in a dangerous service; that the tug's risk was the owner's risk; and therefore, as the tug's general owner, it should have the tug's share of the reward.

The test which the owners pro hac vice ask us to apply to this question, is the bare present ownership of the salving boat, without any other consideration; and the test which the general owner asks us to apply, is the risk of the boat in the salvage service and the corresponding risk to the general owner of losing the boat in that service. To the owner's claim of risk, the charterers reply that it had none, except such as was either compensated by the charter hire or was protected by the charterers as insurers. We believe the question cannot be solved by applying either test separately, and can only be solved by ascertaining what was the measure of ownership possessed by the two, (the general and the temporary owner,) and by determining upon which the loss of the boat would have fallen if she had been destroyed in the salvage service.

The general rule of admiralty law is that the share of a salving boat in salvage compensation belongs to the owner of the boat, for the obvious reason that ordinarily the boat is engaged in the dangerous service at risk of loss to her owner. But there is an exception to this rule, upon which the charterers confidently rely, which is, that the boat's share of salvage is awarded the charterer, if the salving boat is at the time under a charter that amounts to a demise of the boat— locatio navis—or if the charter party so expressly provides. Kennedy on Law of Civil Salvage, 67. The exception, being likewise pred-

icated upon the theory of risk, is enforced only when the loss of the boat in a salvage service would fall upon the charterer. The reason for the exception being precisely the same as the reason for the rule, we are of opinion that the mere fact of ownership, as contended by the charterers, without regard to where the risk lay and where the loss would fall, is not enough to determine where the reward should go. The charterers cite three cases in support of their contention that under a charter of demise the boat's share of salvage belongs unconditionally to the owner pro hac vice. These are The Kaiser Wilhelm der Grosse (D. C.) 106 Fed. 963, 969, 970; The Scout, 1 Aspinall (N. S.) 259; The Maria Jane, 14 Jurist, 859 (Dr. Lushington). A careful reading of these cases shows that they do not support the charterers' contention as broadly made, but indicate on the contrary, that the boat's share belongs to the one who must bear the loss if the boat is destroyed, whether that be the general owner, or a temporary owner under legal liability to make good its loss to the general owner.

In the case of The Kaiser Wilhelm der Grosse, the court awarded the share of the salving tug "Dalzell" to the charterer as against the claim of the general owner, on the ground that the charter was a charter of demise. So far, that decision is authority for the charterers' position in this case; but the court went further, and, showing the terms of the charter, awarded the salvage to that owner at whose risk the boat was put into the hazardous service. Referring to the charter, the court said, the charterer "agreed *unconditionally* to return her to her owner in as good condition as it received her, reasonable wear and tear alone excepted," and that, "If the vessel was damaged in any salvage operation, the *charterer alone was bound to make good the loss*," citing The Scout, L. R. 3 Adm. & Ecc. 522, as "precisely in point."

The Scout clearly sustains the decision in The Kaiser Wilhelm der Grosse, for there too it appears that the charterer "in case of damage to the vessel would have been bound under the charter to repair her. He was bound to deliver her up to the general owners in good condition."

That part of Dr. Lushington's opinion in The Maria Jane, cited as applicable to this case, is nothing more than an argument applied by way of illustration to facts which do not resemble even remotely the facts in this case. Therefore, the paragraph relied upon is scarcely dictum.

Setting aside The Maria Jane, it is clear that the decisions in The Kaiser Wilhelm der Grosse and The Scout were not based upon the bare fact that at the time of the salvage service the boats were under charters of demise, but upon the fact that such charters of demise, by express terms, placed liability for damage to and loss of the demised boats upon the charterers. The courts found that the boats were engaged in salvage service at the risk, not of the general owners, but of the charterers, owners pro hac vice, and that as the risk was theirs, the reward should be theirs also.

The decisions in The Kaiser Wilhelm der Grosse and The Scout bear upon the case before us in that they show that a charterer by

demise is entitled to the owner's share of salvage when the boat is engaged in salvage service at the charterer's risk, and, inferentially that the general owner is entitled to the boat's share when the boat is put into the service at his risk. But The Arizonan (D. C.) 136 Fed. 1016, and 144 Fed. 81, 75 C. C. A. 239, bears more directly upon the case. There, the tug "Unique" was awarded salvage for services rendered the steamship Arizonan when on fire. The tug was at the time under charter, which was not a charter of demise. The owner claimed the whole of the salvage compensation; the charterer claimed a part of it. The District Court awarded it all to the owner, under the general rule "that the owner is entitled to such reward unless there is a demise of the tug or the contract of hiring stipulates to whom it shall belong." The Circuit Court of Appeals reversed this decision and divided the salvage between the owner and the charterer, according as each had contributed in earning the salvage reward. It said in its opinion that:

"It is true that several text-writers have stated the rule broadly that a charterer is not entitled to salvage unless he becomes the owner pro hac vice, but we are referred to no controlling authority to that effect and are not impressed by the rationale of the rule. The theory of salvage is to reward all who have contributed anything to the work of saving the imperiled property. Thus, it has included the risk assumed by the salving vessel, her services and the services of her master and crew not only, but it has been extended to services rendered by passengers and, in some instances, remuneration has been awarded for the risk to her cargo. There never has been any difficulty in segregating these interests and we see no reason why it may not be done even when the risk to the vessel and the services she renders are represented by different individuals.

"At the time in question the appellant was entitled to the exclusive use of the tug and to every dollar she might earn during the existence of the charter. On the other hand, the appellee, not having parted with the ownership, was entitled to renumeration for any risk the tug might run while engaging in a dangerous salvage service. We are unable to see why the right to receive remuneration on account of the ownership, which was retained, carries with it the right to remuneration for the services which passed, without qualification, to the appellant. The two are as separate and distinct as are the risk of the tug and the services of her crew. * * *

"The solution of the present controversy seems plain. The appellee owned the tug, the appellant owned the tug's services. She was in a dangerous occupation and for the risk so run the appellee is entitled to compensation. She did the work of rescuing the Arizonan from the burning dock and for these services the appellant is entitled to compensation."

To the same effect is the decree in The New Orleans (C. C.) 23 Fed. 909.

The decision in The Arizonan bears upon several phases of the case before us. It is authority for the claim of the charterers to at least a part of the boat's share in the salvage, as against the claim of the general owner for the whole of it, and is authority for a claim of the owner to at least a part of the salvage if it appear that the boat earned the salvage at risk of loss to its owner. The important point of the decision, as bearing upon the claims of both owner and charterers, is, that the right of the general owner to a boat's share of salvage is not in all instances absolute, and is not, therefore, exclusive of all other claims that may be asserted against it, but that the claim of the owner must yield to claims of others with equal merit, and that salvage may

be apportioned. If the owner's claim to salvage earned by a boat not under a charter of demise is not absolute and exclusive, then, similarly, the claim of an owner by demise cannot be higher than that of an owner who has not parted with his boat, and cannot be exclusive of all other claims. If the claim of an owner of a boat not demised is subject to deduction in favor of the claim of a charterer, (The Arizonan,) so also may the claim of a charterer, made owner pro hac vice by a charter of demise, be subject to deduction in favor of claims of others contributing to the earning of the salvage reward. Of such may be the general owner, who contributes his boat as the instrument by which the salvage is earned. When a boat having two owners with different interests is put into such a service and is subjected to the hazard of loss, as concededly the boat was in this instance, the one question which determines the right to salvage, is—Which owner would have sustained the loss if the boat had been destroyed in the service? For answer to this question, we must go to the charter and examine its terms, both expressed and implied.

[2, 3] The charter is undoubtedly a demise of the tug by the owner to the charterers for general service, subject to one limitation not pertinent to this discussion. It contains by expression no covenant to return the boat to the owner in good condition, or to repair her damages, or make good her loss. The charterers were entitled, under the charter, to engage the tug in any proper nautical enterprise, which includes salvage operations. The charter is silent upon the subject of salvage service and upon the division of salvage compensation. The parties, therefore, in failing to stipulate which was to bear the risk of loss of the boat in salvage and other operations, left the risk where the law places it. While in every charter there is an implied covenant to deliver up the vessel at the end of the term, that covenant alone does not make the charterer an insurer. Lake Michigan, etc., Co. v. Crosby (D. C.) 107 Fed. 723, 724; Killam & Co. v. Monad Engineering Co. (D. C.) 216 Fed. 438, 442. Nor does it alter the nature of the contract of charter. This the law makes a simple bailment for hire. In such a contract the charterer stands as a bailee for hire, who is only responsible for ordinary diligence and is only liable for ordinary negligence in the care of the property bailed. As this is the rule, not only of the common law, but of the general law as applied to this subject, the hirer is not responsible for the failure to return the thing hired when it has been lost or destroyed without his fault, unless he has, either expressly or by fair implication, assumed the absolute obligation to return, even though the thing hired has been lost or destroyed without his fault. Strum v. Boker, 150 U. S. 312, 14 Sup. Ct. 99, 37 L. Ed. 1093; Sun Printing & Publishing Ass'n v. Moore, 183 U. S. 642, 654, 22 Sup. Ct. 240, 46 L. Ed. 366. We are of opinion that there is in this charter no implied undertaking to return the boat. The parties stipulated with respect to the loss of the boat on a certain run and provided for either a policy of insurance or a bond of indemnity to protect the owner against loss of the boat on that particular run. No provision was made to protect the owner on any other run or in any other service in which the charterers might engage the boat. The in-

clusion of the covenant covering the owner's risk of losing the boat in one kind of service on one particular run excludes the implication that the charterers covenanted safely to return the boat to the owner from other kinds of service on other runs, and therefore leaves the parties to the law of bailment for hire as applied generally to charters. Clark v. United States, 95 U. S. 539, 542, 24 L. Ed. 518; Sun Printing & Publishing Ass'n v. Moore, 183 U. S. 642, 654, 22 Sup. Ct. 240, 46 L. Ed. 366; W. H. Beard Dredging Co. v. Hughes (D. C.) 113 Fed. 680, 682, affirmed 121 Fed. 808, 58 C. C. A. 192; Bleakley v. City of New York (D. C.) 139 Fed. 807; Lake Michigan, etc., Co. v. Crosby (D. C.) 107 Fed. 723, 724; Charles Killam & Co. v. Monad Engineering Co. (D. C.) 216 Fed. 438, 442.

Without repeating the very full discussion of the learned trial judge upon this subject, we find ourselves in entire accord with his conclusion, and hold that in the absence of negligence in handling the tug (of which none is charged), the risk of loss of the tug while rendering the salvage service in question, was upon the general owner, and that, accordingly, the general owner is entitled to compensation for what it risked.

The distribution of the salvage fund being decreed on the basis of risks incurred, we must ask—What did the general owner risk, and what did the charterers and crew risk? The crew risked their lives. No one questions that. And as no one questions the salvage awarded the crew as a whole, (which for the moment we shall consider as one-third,) we must assume that their reward was equitably commensurate with the risks they incurred. This leaves substantially two-thirds of the fund to be divided between the general owner and the charterers, according to their respective risks. What the owner risked was its boat; no more, no less. Its boat was worth $8,000. It therefore risked that sum. It got that sum in the award. In getting all that it risked, we think it should not complain. The value of the boat's service to the rescued scows, urged by the owner as a consideration inducing a larger reward, is too much involved with the meritorious service of the crew, whose reward cannot be altered without an appeal, to justify changing the theory of the awards.

What did the charterers risk to entitle them to a third of the fund, plus what is left of the one-third from which the owner's $8,000 is to be deducted? Having the entire services of the boat, the charterers were, of course, entitled to compensation for the risk of losing it. It is a little difficult to say, in view of the rather small monthly charter hire, that these services were worth from $8,000 to $10,000 for the balance of the term. Yet, as we must assume, in the absence of an appeal, that the crew were fully paid for their risks, and as we find that the owner was fully paid for its risk, the balance must go to the one other party that contributed to the earning of the salvage fund. If the charterers' share is excessive, it may be because the salvage fund is excessive. As to that, however, there is no complaint by the only parties qualified to complain, namely, the ones paying the salvage. We therefore find no error in the distribution of the salvage fund to the

crew, the charterers, and the owner, except as affected by certain minor allowances next to be considered.

By its decree, the trial court awarded $1,500 to Foley & Martin, proctors for the charterers, for their services in creating the fund; and $1,250 to Silas B. Axtell, proctor for the original owner, for professional services.

The owner and charterers appear here as contesting claimants for the whole salvage fund (after paying the crew) and, failing that, are striving for the position of residuary distributee. Both are interested alike in the size of the fund and in opposing its diminution by the allowance of fees for professional services. Therefore, both have appealed from such allowances.

Both owner and charterers appealed from the allowance to Silas B. Axtell, proctor for Seaboard Equipment Corporation, original owner. Scanlan & Company, who are entitled under the decree to the residuum of the fund, object to the allowance of any fee to Axtell, but urge, that if a fee is to be allowed him, it should be paid not out of the general fund, but out of the fund awarded Shewan & Sons, Inc., upon the ground that this concern succeeded to the salvage rights of Seaboard Equipment Corporation, and succeeded also, it is claimed, to its liability to Axtell for his fee. Shewan & Sons, Inc., having succeeded to the liability of the Seaboard Equipment Corporation to Axtell for his fee, or having conceded that the salvage fund is liable for Axtell's fee, acts as though it were estopped, by one position or the other, from contesting the allowance altogether, and therefore maintains merely that the allowance to Axtell is excessive and should be reduced to a reasonable amount; and when reduced, should not be paid out of the fund awarded it, as the court first ordered, but should be paid out of the general fund.

At the trial, Axtell claimed that he had an equitable lien upon the fund to the extent of 50 per cent. growing out of an equitable assignment of 50 per cent. of the claim to him, and that he was entitled to recover the same as an independent party. Shewan & Sons, Inc., admits that Axtell is entitled to recover reasonable compensation for his services from the time he was retained by the Seaboard Equipment Corporation until discharged by Shewan & Sons.

[4] We briefly dispose of this controversy by holding with the trial court, that Axtell did not have an equitable lien upon the fund, and by holding further, that whatever arrangements Axtell had for fees, they were between him and his client. If the fees are in dispute, they cannot be litigated in this proceeding; in any event, they are not properly chargeable as a cost or an expense in an admiralty proceeding.

[5] The court allowed Foley & Martin $1,500 "for their services in creating the fund." This sum was made payable out of the general fund before it was divided into thirds. From this allowance Shewan & Sons, Inc., appeals, because conceivably it might reduce its share of the fund. Foley & Martin are doubtless entitled to credit for their industry in creating the fund, and are entitled to compensation. But their industry was exerted not on behalf of the court

or of the general litigation, but on behalf of their clients, to whom alone, we think, they should look for compensation. We find no authority for taxing such fees as costs in an admiralty proceeding. What authorities we find lean the other way. The Baltimore, 8 Wall. 377, 19 L. Ed. 463; The Alice (D. C.) 12 Fed. 496, 502. At all events, we are not inclined to institute or sanction a practice of such doubtful propriety. We are of opinion, therefore, that the claims of Foley & Martin and of Axtell, for professional services, should be disallowed, and that to this extent the decree below should be reversed.

[6] The remaining question has to do with the share of the master of the tug in the salvage and is raised on the appeal of Shewan & Sons, Inc., general owner. George O. Wilson, the master of the tug, was under contract with Scanlan & Company, the charterers, to operate the tug for one-third of the profits. Of the award to the charterers, the master will get a third, by force of his contract; and of the award to the crew, he will get a share, by force of the decree. Shewan & Sons, Inc., maintains that the master is not entitled to share in the salvage awarded the crew, because of his share in the salvage awarded the charterers. But the latter share is not awarded the master under the decree or by reason of this litigation; he is entitled to it under his contract with the charterers. The existence of such a contract does not detract from his right as a member of the crew to share in a reward which the law gives the master as well as the rest of the crew for salvage services. The master risked his life in a courageous act and saved a large amount of property. The owner did nothing at the time, and nothing afterward, except to claim compensation for perils to its boat, through all of which the master safely navigated her. We find no error in the allowance to the master.

The decree below, when modified in accordance with this opinion, is affirmed.