## WHITE v. SCHOONMAKER-CONNORS CO., Inc.

(Circuit Court of Appeals, Third Circuit.  May 24, 1920.)

No. 2527.

**1. Shipping ⊕=41—Hiring of scow constituting demise.**

A charter under which the owner furnished scows, without motive power and on which he kept only a caretaker, to carry cargoes of clay, the towing, loading, and discharging to be done by the charterer, who paid an agreed hire per day, *held* a demise, by which the charterer became pro hac vice the owner.

**2. Shipping ⊕=54—Hirer of scows liable for want of ordinary care.**

A hirer of scows under a contract which amounts to a demise is not an insurer of their safety, but is liable for any damage to them due to failure on his part, or of those for whom he is responsible, to exercise ordinary care in using or handling them.

**3. Shipping ⊕=54—Liability of charterer for injury.**

While failure of a hirer to return a vessel in as good condition as when received, reasonable wear excepted, raises a presumption of liability for negligence, such presumption does not enlarge his substantive obligations or liability.

**4. Shipping ⊕=54—Charterer liable for injury by negligence of independent contractor.**

The charterer of a vessel by demise is liable for any damage sustained by it, due to negligence of a third person, although an independent contractor, whom he has permitted to use it or to perform any of the purposes for which it was chartered.

**5. Shipping ⊕=54—Charterer not liable for injury to scow due to unseaworthiness.**

Where libelant contracted with respondent to furnish scows to carry not less than 500 yards of clay each, whether wet or dry clay not being specified, an injury to one of the scows, caused by its listing while being loaded with wet clay, which caused the clay to slide, *held,* on the evidence, not due to improper loading, but to the fact that the scow, which was a deck scow, was not fitted to carry such cargo, and respondent *held* not liable for the injury.

Appeal from the District Court of the United States for the District of New Jersey; J. Warren Davis, Judge.

Suit in admiralty by the Schoonmaker-Connors Company, Incorporated, against John P. White.  Decree for libelant, and respondent appeals.  Reversed.

Thomas F. McCran, of Paterson, N. J. (Joseph P. Nolan, of New York City, of counsel), for appellant.

Macklin, Brown & Purdy, of New York City (William F. Purdy, of New York City, of counsel), for appellee.

Before BUFFINGTON, WOOLLEY, and HAIGHT, Circuit Judges.

HAIGHT, Circuit Judge.  The Schoonmaker-Connors Company, Incorporated, which for the purposes of this case, may be considered as the owner of the deck scow P. J. Kane No. 2, filed a libel against the

⊕=For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

appellant in the court below to recover for the damage that the scow sustained while under charter to the appellant, and was awarded a decree.

[1] The first question is whether there was a demise of the scow to the respondent, or whether the contract between him and the libelant was merely one of affreightment. It appears that the respondent, who needed some clay for work which he was doing in connection with a sewer near Newark, N. J., and who had contracted to procure it at Haverstraw on the Hudson river, arranged with one Bennett, from whom or through whom he purchased the clay, to secure a scow or scows to transport it from Haverstraw to Newark. Bennett thereupon applied to the libelant for the scows, and the latter, after some preliminary negotiations, agreed to furnish the scow which was subsequently damaged and another at a certain sum per day. Both the respondent and Bennett stated that the former wished each scow to carry 600 yards of clay, and the libelant undertook to furnish scows that would carry at least 500 yards.

The preliminary negotiations were verbal, but were confirmed within two days thereafter by a letter written to the respondent by the libelant. Both boats were without any motive power of their own, and although the master, or, more properly speaking, the caretaker, who was on board, was paid by the owner of the vessels, so far as appears, he had nothing to do with the real navigation or direction of the movements of boats or the manipulation of their cargoes. Nor was the libelant to have any part in loading or unloading them. The boats were to be towed to and from Haverstraw by an independent towing company engaged by the libelant, as a matter of convenience, for the respondent. So far as appears in the evidence, from the time the boats left their moorings in New York, they were under the exclusive command and control of the respondent, in the sense that he alone had the power to direct their movements and use, although the actual navigation was, of course, attended to by those in charge of the tugs and in a certain and limited degree by the caretaker. Under these circumstances, we have no difficulty in reaching the conclusion that the learned judge of the court below was correct in holding that the scows were demised to the respondent, so that he became pro hac vice the owner thereof. In re Johnson Lighterage Co. No. 24 (D. C. N. J.) 240 Fed. 435, 438, affirmed 248 Fed. 74, 160 C. C. A. 214 (C. C. A. 3d Cir.); The Daniel Burns (D. C. S. D. N. Y.) 52 Fed. 159; Monk v. Cornell Steamboat Co., 198 Fed. 472, 117 C. C. A. 232 (C. C. A. 2d Cir.); Hastorf v. Long, 239 Fed. 852, 152 C. C. A. 638 (C. C. A. 2d Cir.); White v. Upper Hudson Stone Co., 248 Fed. 893, 160 C. C. A. 651 (C. C. A. 2d Cir.).

[2] Such being the character of the contract between the parties, and there being no stipulation enlarging the common-law liability, the respondent was not an insurer of the safety of the scows, but was liable for any damage to them which was due to failure on his part, or on the part of those for whose acts he was responsible, to exercise ordinary care in using or handling them. In re Johnson Lighterage Co. No. 24, supra.

[3] Although it is true that, because the scow was damaged while under the control of the respondent, there was a presumption of liability for negligence arising from a failure to return it in as good order as when received, reasonable wear and tear excepted, and that this presumption cast upon the respondent the obligation of showing that the damage was not the result of his own negligence, or that of any one for whose acts he was responsible, it did not enlarge his substantive obligations or liability. White v. Upper Hudson Stone Co., 248 Fed. 893, 160 C. C. A. 651 (C. C. A. 2d Cir.); Mulvaney v. King Paint Mfg. Co., 256 Fed. 612, 615, 167 C. C. A. 642 (C. C. A. 2d Cir.).

[4] The injured scow was damaged while being loaded with clay at Haverstraw. The immediate cause of the accident was the listing of the scow, and the consequent sliding of the clay to one side, which bent the rail, and in connection therewith damaged other parts of the scow. The loading was not being done by the respondent, or by any one in his employ, but by an independent dredging concern, apparently engaged for that purpose by the person from whom the respondent had contracted to purchase the clay. But this circumstance does not, we think, relieve the respondent from the liability to answer for negligence in loading, if there was any, because the general principle is that a charterer or bailee of a vessel, such as the respondent was, is liable for any damage sustained by the vessel, due to the negligence of a third party, although an independent contractor, whom he has permitted to use it, or to perform any of the purposes for which it was chartered. White v. Upper Hudson Stone Co., 248 Fed. 893, 160 C. C. A. 651 (C. C. A. 2d Cir.); Gannon v. Consolidated Ice Co., 91 Fed. 539, 33 C. C. A. 662 (C. C. A. 2d Cir.); Smith v. Bouker, 49 Fed. 954, 1 C. C. A. 481 (C. C. A. 2d Cir.).

[5] The next and decisive question is therefore as to exactly what caused the scow to list. The libel alleges and the libelant contends that it was caused by improper loading, while the respondent insists that it was due to the fact that the vessel was unsuited to carry clay of the kind with which it was being loaded, or, for that matter, any kind of clay. In this connection, it should be observed that the court below found that it was not the proper kind of a scow to carry "wet" clay—clay dug from the bottom of the river—and "that the accident was due to this unseaworthiness." With this conclusion, we are in accord. The boat was a deck scow, designed to carry its load on deck and not in the hold, as would be the case if it had been a dump scow. Two witnesses testified that dump scows, and not deck scows, were used to carry clay. One of these witnesses, the owner of the brickyard in the vicinity of which the clay was being dug, testified that he had never seen "wet" clay loaded on a deck scow, and, furthermore, that he did not think that a scow of that kind was fitted to carry "any material of the same substance as clay," because, due to its slippery character, it would not remain stationary. The captain of the dredge, whose experience covered a great many years, testified that on only one occasion had he seen a deck scow loaded with mud or clay, and on that occasion the clay had been dug on land, and not from the river. There is not a particle of testimony to contradict this. In-

deed, all of the circumstances indicate that such a scow as the one in question was not fitted to carry "wet" clay, if, indeed, any other kind of clay. The rail was only 18 inches above the deck, and if for any reason the scow should be thrown slightly off an even keel, there was nothing to prevent the clay from sliding to one side or the other, which of necessity would cause the scow to list and the clay to slide still further in that direction. In that event, an accident such as happened in this case would be inevitable. The other scow, which was chartered, and which was first loaded at Haverstraw, although guaranteed to carry over 500 yards of clay, brought in only 305 yards, because it was deemed unsafe to load it with more, and the damaged one brought in only 230 yards.

The only evidence from which negligence in loading could be predicated is that given by the captain of the scow, who had never seen a deck scow loaded with clay, to the effect that, in his judgment, it was not properly loaded. While admitting that he thought the proper way to load it was to deposit the clay in the center of the scow—along a line drawn from the bow to the stern midway between the sides—so that it would run over to either side, as was done in this case, he seems to advance two variant criticisms of the precise manner in which this scow was loaded: (1) That the clay was piled too high in the center, which caused it to take a sudden slide to one side; and (2) that more was placed on one side than on the other, which caused the boat to list in that direction. It is quite difficult to ascertain from his testimony exactly wherein he thought that the fault in loading, if any, lay. If it was in the first respect mentioned by him, we are confronted by the fact that it was admittedly proper to first deposit the clay in the center, so as to permit it to slide to the sides; that the scow was not then loaded to over three-fourths of its guaranteed capacity, although the clay was then almost, if not entirely, up to the rail on both sides, and that there is no evidence as to how it could have been further properly loaded, except by placing the clay where it was placed. If it had been placed on either side after the clay had been piled too high, as the witness says, in the center, it would have caused the scow to list, and, doubtless, brought about just such an accident as eventually happened. If the fault was in the second of the above respects then his testimony as to too much being placed on one side is nullified by his other testimony that it was piled too high in the center, as it is also contradicted by the testimony of the captain of the dredge, who testified that he placed all of the clay in the center, and permitted it to slide to the sides and level itself, a peak thus being formed in the center. Moreover, the list was complete and damage done within two to five minutes after the vessel began to list.

Much stress has been laid by counsel for the libelant on the following excerpt from the testimony of the captain of the barge: "Q. And you knew she would take a slide, of course? A. Sure, I knew she would take a slide." But this extract must be read in connection with his other testimony. He was testifying as to what would happen when the clay was deposited in the center of the scow.

Upon the whole, therefore, we think that the only legitimate con-

clusion that can be drawn from the evidence is that the listing or careening of the scow, which proximately caused the damage, was not due to any improper loading, but to the sliding of the clay after it had been properly loaded, and that the sliding was in turn caused by the unfitness of the scow to carry that kind of material. But the libelant contends that the scow was not chartered to carry "wet" clay, and therefore that the accident cannot be said to be due to any unseaworthiness which was within the contemplation of the parties. It is not sought, however, to rest liability on the fact that the scow was used for a different purpose than that for which it was chartered; the contention is that it was fit to carry "wet" clay, if it had been properly loaded. But, as before stated, we cannot find that the evidence justifies the conclusion that it was improperly loaded. Nor, if we may depart from the issues framed by the pleadings, do we think that any liability can be predicated on the fact that the vessel was loaded with "wet" clay rather than what has been spoken of in the case as "dry" clay—clay dug from the land, as distinguished from clay dug from the bottom of the river—on the theory that the scow was used for a different purpose than that for which it was chartered. There is no evidence whatsoever that the character of the clay which the scow was to carry was discussed by the parties at the time it was chartered. The respondent, so far as the evidence shows, was unfamiliar with vessels and relied on the libelant to furnish scows suitable to carry at least 500 yards each of clay from Haverstraw, where it was to be dug, to Newark.

We think that the fair inference from the evidence is that both parties contracted without having in mind the exact character of clay which the scows were to carry. Hence, as it was demonstrated that the injury to the vessel was not due to any fault of the respondent, or those for whose acts he is responsible, and as he was not under an absolute obligation to return it in as good condition as when received, reasonable wear and tear excepted, but was required to exercise only ordinary care in his use of it, he is not liable for the damage which it received.

The decree of the court below will therefore be reversed, with costs.