## TURNEY TRANSPORTATION CO. v. NATIONAL DREDGING & LIGHTERAGE CO.

(District Court, E. D. Pennsylvania. May 10, 1921.)

No. 52.

1. **Shipping ⬦58(2)—Evidence held to show charterer agreed to return lighter in good condition.**

   On a libel for damages sustained by the sinking of a chartered lighter, evidence that, after the sinking, the charterer's president stated he had agreed to raise the lighter, *held* to corroborate the owner's evidence, denied by the charterer, that a provision of the charter required the return of the lighter in good condition.

2. **Shipping ⬦54—Implied agreement to return does not make charterer insurer.**

   The agreement implied in a charter party for the return of a chartered vessel in the same condition as when delivered does not, alone, make the charterer an insurer, so as to hold him responsible for failure to return, where the boat was lost or destroyed without his fault.

3. **Shipping ⬦58(2)—Evidence held to show compliance with warranty of seaworthiness of chartered lighter.**

   Evidence by two masters of a chartered lighter that she was not leaking just before she sank, and that she was not cranky in handling, *held* to show compliance by the owner with his warranty of seaworthiness of the lighter and of her fitness for the purpose intended.

4. **Shipping ⬦58(2)—Evidence held to show overloading by charterer was cause of sinking.**

   On a libel to recover damages for the sinking of a chartered lighter, used in hauling sand from a dredge, evidence *held* to show that the sinking was caused by the improper loading of too much sand at the stern of the dredge.

5. **Shipping ⬦54—Charterer liable for improper loading over protest of lighter's master.**

   Though the loading of a chartered lighter is ordinarily in charge of her master, the charterer is liable for the overloading of the stern of the lighter over the protest of the master, who had no means of enforcing his protest, since the lighter was without power, so that the master could not remove her, except by casting adrift.

In Admiralty. Libel in personam by the Turney Transportation Company against the National Dredging & Lighterage Company. On final hearing. Decree rendered for libelant.

Lewis, Adler & Laws, of Philadelphia, Pa., for libelant.

Willard M. Harris, of Philadelphia, Pa., for respondent.

THOMPSON, District Judge. The Turney Transportation Company, owner of the deck lighter Emma, filed its libel in personam against the National Dredging & Lighterage Company, to recover dam-

ages alleged to have been suffered by the libelant in consequence of the sinking of the lighter while under charter to the respondent. The respondent was engaged in the business of dredging in the Delaware river, and, during the period covering the controversy in this case, was operating the dredge National below Whitehill, N. J.

A verbal charter was entered into between the libelant, through its directing manager, George W. Patterson, and the respondent, through its president, Frank Caven, for two lighters, one of which was the Emma, at $11 per day for lightering sand during the season of 1919 from the dredge to the respondent's wharf at Tioga street, Philadelphia. The libelant claims there was an agreement that the lighter should be delivered up to it in the same condition as when received. The respondent denies such an agreement.

The lighter was delivered to the respondent and taken away by its tug on April 23, 1919. It was without motive power, and was in charge of one man as master and caretaker. It is constructed of wood, about 110 feet long, 28 feet beam, and about 8 feet depth of hold, with a deck upon which cargo was carried.

The National is a river dredge, and was in charge of a master, mate, and crew. The lighter was used under the charter in receiving and carrying sand from April 23 to June 30, 1919. On the latter day she was tied up on the port side of the dredge, receiving a cargo of sand. The sand was delivered upon the deck of the lighter by means of a chute from the dredge, and, while the sand was still being discharged through the chute upon the lighter, the latter turned over and was sunk. The libelant claims damages based upon the cost of raising the lighter and the loss of its use from June 30 to September 19, 1919.

[1] While the libelant claims that, under the terms of the charter party, the lighter was to be returned in the same condition as when received, the evidence on its behalf is principally directed to proof of negligence on the part of the respondent's master and crew in their manner of loading. The weight of the evidence, however, is in favor of the libelant's contention that Mr. Caven agreed to return the lighter in good condition. This is testified to by Mr. Patterson, and, while it is denied by Mr. Caven, Mr. Patterson's testimony is corroborated by that of Jesse A. Gray, who was engaged in the business of submarine diving and wrecking. He testified that on July 12 Mr. Caven requested him to go to Bordentown to examine the lighter, and stated to him that he had agreed with Mr. Turney, president of the libelant company, to raise the boat.

In pursuance of further conversation with Mr. Caven, he went at his direction on July 17 to make an examination of the sunken lighter, and did examine it. Mr. Caven's conduct, subsequent to the sinking, clearly indicates that he considered the respondent responsible for the raising of the lighter. It is difficult to explain it on any other ground. It is found as a fact that the agreement was made as alleged by the libelant.

[2] Judge Dickinson held in Killam & Co. v. Monad Engineering Co. (D. C.) 216 Fed. 438, that a covenant for the return of a chartered vessel in the same good order and condition as when originally deliver-

ed is implied in a charter party. And Judge Woolley in Johnson Lighterage Co., No. 24, 248 Fed. 80, 160 C. C. A. 214, held that, while there is an implied covenant to deliver up a vessel at the end of the term, that covenant alone does not make the charterer an insurer, so as to hold him responsible for failure to return, where the boat has been lost or destroyed without his fault. If, therefore, the sinking of the lighter was the result of the negligence of the charterer, the covenant to return applies, without regard to an expressed agreement in the charter.

[3] On the other hand, there is an implied warranty of seaworthiness and fitness for the use to which the boat is intended to be put. Upon the evidence, the libelant has sustained the burden of proof, from which it is found that the lighter was in all respects seaworthy at the time it was delivered to the respondent. Both the masters of the boat, Capt. Bowes and Capt. Devlin, who succeeded him in charge of her during the time she was under charter, testified that she was in good condition, did not leak, and was not "cranky"; the latter condition being that to which some of the respondent's witnesses attribute her capsizing. There was no water in her hold of any consequence on the morning of the day she turned over. She had prior thereto been examined and recaulked, where necessary, at the Delaware Shipyard. Capt. Bowes, who was familiar with the vessel and who slept on her at night, and Capt. Devlin, who lived on the boat with his wife, both gave testimony, which, together with that of Mr. Patterson, in the absence of anything to controvert it, affords a prima facie case of the boat being in good condition and not "cranky."

[4] The libelant contends that the cause of the turning over of the boat was her being improperly overloaded at the directions of the master of the dredge, through the man in charge of the chute placing, after she was loaded to her capacity, an additional quantity of sand at her stern.

The respondent contends that the master of the lighter was in entire control of her loading, and that, if she was improperly loaded, it was because the master of the barge did not properly direct the placing of the load through the chute. There was evidence on the part of the respondent tending to show a general custom requiring the master of a lighter to direct her loading. That that is the ordinary duty of a barge master within reasonable limitations is found from the evidence and is sustained by the testimony of Mr. Patterson on cross-examination:

Q. * * * The work [shooting the sand down the chutes onto the barge] is done by the dredge, but it is the business of the barge master, as you have seen in your experience, the barge master stands on the sand on the barge directing where the sand shall be loaded; is not that your experience? A. Yes; it should be that way.

The facts in connection with the capsizing are found to be as follows: While being loaded, the lighter was placed in position by moving her forward or aft by means of lines worked by the gypsy winch. The barge had been loaded at the stern down to within a few inches of her rail. The master of the barge instructed the chute tender on the dredge that he had enough sand on the stern of the barge. The chute

272 F.—32

tender thereupon pulled the barge back so as to bring her bow under the chute. The master of the dredge, upon observing the load on the lighter, instructed the chute tender that he should put more load on the stern. After completing the load at the bow, the chute tender pulled the lighter forward and turned the sand from the chutes onto the stern, and then began filling up in the center. While putting this additional load on, the lighter rolled over and capsized.

It is apparent that the capsizing of the lighter was due to overloading her stern, which was about 6 inches out of water when the master of the dredge had instructed the chute tender to put more on the stern. The stern was put under water and the capsizing resulted, when, after putting the additional load on the stern, the chute tender had begun to put the usual load in the center. The additional load was put on the stern after protest by the master of the lighter that she already had sufficient load there.

[5] The respondent contends that, even if the captain of the lighter did protest against the additional load, the barge was under his control, and he was therefore responsible for whatever was done. It appears from the testimony, however, that the Emma, being without motive power, could not have been taken away by her master unless he had cut the lines and allowed her to go adrift. That, in all probability, would not have obviated her turning over. It is found that the master of the lighter remonstrated against the overloading. While it was his duty to direct the loading, it was also the duty of those on the dredge to load in accordance with his directions. Instead of heeding his remonstrance, however, they took the responsibility into their hands of placing the additional load upon her, and the fault, which caused the capsizing, is therefore that of the respondent.

A decree will be entered in favor of the libelant, with costs, for damages resulting from the sinking of the lighter, including the reasonable cost of raising and repairing her, and those resulting from the loss of her use from the time she was sunk until repaired and fit for service, with reference to a commissioner to ascertain and report the damages.