THE RENO.

THE MADELINE MESECK.

O'DONNELL v. BARNES–AMES CO., Inc.,
et al.

Nos. 31, 32.

Circuit Court of Appeals, Second Circuit.
Dec. 5, 1932.

AUGUSTUS N. HAND, Circuit Judge,
dissenting in part.

Macklin, Brown, Lenahan & Speer, of
New York City (Horace L. Cheyney, of New
York City, of counsel), for appellant Meseck
Towing Line, Inc.

William F. Purdy, of New York City
(John E. Purdy, of New York City, of coun-
sel), for appellee O'Donnell.

Otto & Lyon and Shattuck, Bangs & Win-
ant, all of New York City (Henry E. Otto,
of New York City, of counsel), for appellee
Barnes-Ames Co., Inc.

Single & Single, of New York City
(Thomas H. Middleton, of New York City,
of counsel), for appellees Joseph A. Ryan
and others, as executors of the Estate of
George Taylor.

Before MANTON, AUGUSTUS N.
HAND, and CHASE, Circuit Judges.

MANTON, Circuit Judge.

On June 8, 1928, the barge Reno was un-
der a demise charter, made by the appellee
Taylor acting as agent for the appellee
Barnes-Ames Company, Inc. Below it is
held that the charter was by Taylor who later

subchartered the boat to Barnes-Ames Company, Inc. It was loaded with grain by the Barnes-Ames Company, Inc., in Brooklyn, on June 9, 1928 (Saturday), and towed that afternoon to Hoboken and moored on the south side of Pier 1. On the following Monday morning the appellant's tug Madeline Meseck shifted the barge alongside of the elevator New York, which in turn was lying alongside of a steamer also moored on the south side of Pier 1 but farther out than the Reno. A towing line from the Meseck was made fast to the Reno's stern. The bargee said that he made the line fast, while other witnesses said that Wittnebert, a harbor master, did so. There is a conflict in the evidence as to whether in shifting the Reno the Meseck caused it to collide first with a grain barge moored across the slip on the north side of Pier 2 and then with the grain elevator alongside of which the barge Reno was being towed. It is alleged that the injury complained of was caused when the starboard side of the Reno collided with a corner of the elevator. All of the witnesses for the tug Meseck testified that the Reno did not strike the corner of the elevator but was landed parallel to it, and a few feet away, and then was hauled in alongside of the elevator. But, about two hours afterward, it was discovered that the Reno was leaking badly. Tugs were brought to her assistance, and she was finally towed to a dry dock in Brooklyn, where a survey was made, and it was found that the bilge log and the log immediately above it were cracked, the cracks running fore and aft. The bargee's testimony that the Reno struck a corner of the elevator was uncorroborated, and was contradicted by the master of the tug, her deck hand, and the superintendent of the elevator. The last was a disinterested witness. Thus there was presented the usual contradictory testimony of everyday occurrences in admiralty cases.

After the bargee testified and the appellee O'Donnell rested his case, one Wittnebert, a harbor master at the pier, was called as a witness by the appellant. He said that the bargee was not on the Reno when she was shifted, and that he handled the lines. This gave rise to a conflict between the bargee and Wittnebert, and, before finishing the latter's testimony and hearing any other witnesses, the judge presiding announced:

"We have a conflict of evidence that is absolutely diametrically opposed. The captain told me that he was on the boat and this man says he was not on his boat that morning. The two courses are open, either

to have one or other of these men confess that they testified wrongly about it, or else for me to believe one or the other of them, and in either event the man that has testified falsely will have to be punished. It is criminal contempt to testify falsely and when you get to a statement like that you have to take notice of it. I mean to be perfectly stern about this, when anybody testifies falsely before me, and I make up my mind that he has done so, he is going to be punished."

Later, just before the midday adjournment and while Wittnebert was still testifying, the following took place:

"The Court: Well, I am going to inaugurate a practice that has some teeth in it. You had better let me see it (referring to a statement).

"Mr. Cheyney: No, sir, I don't wish to.

"The Court: Now, Mr. Middleton, you search Captain Luckey's conscience and, Mr. Cheyney, you search the other man's conscience, and if they persist in the testimony they are giving now I will decide which one I think is lying and the one who is lying will have to go to jail. I have already tested this power, and we will have the District Attorney here after luncheon. It is going to be very strictly enforced. Of course if you don't want to let me look at that statement, all right; but this man is in jeopardy and the other man is, and I will let them go paroled in the custody of their respective counsel. Mr. Middleton, you see about Luckey, and, Mr. Cheyney, you see about this witness.

"Mr. Middleton: Your Honor, we have no control over this witness.

"The Court: I will parole him in your custody. Captain Luckey, you come back at 2:30 and (to the witness Wittnebert), you come back at 2:30.

"The Witness: Yes."

At the conclusion of Wittnebert's testimony the court said:

"I have a very solemn and disagreeable duty to perform, and I think that I will suspend the trial of the case now, and deal with this man (referring to Wittnebert); and I should like to have Mr. Lyon called in order to see what he has to say about the statement."

At this stage the court disclosed that he had formed an opinion that Wittnebert, a material witness for the appellant, was swearing falsely.

██ Wittnebert was not guilty of criminal contempt for giving the testimony he did

even though it may have been false, and the court was without power during the hearing in the principal case to initiate a contempt proceeding. Ex parte Hudgings, 249 U. S. 378, 39 S. Ct. 337, 339, 63 L. Ed. 656, 11 A. L. R. 333. In that case the Supreme Court discharged a petitioner who had been committed for contempt for testifying falsely, and said:

"An obstruction to the performance of judicial duty resulting from an act done in the presence of the court is, then, the characteristic upon which the power to punish for contempt must rest. This being true, it follows that the presence of that element must clearly be shown in every case where the power to punish for contempt is exerted—a principle which, applied to the subject in hand, exacts that in order to punish perjury in the presence of the court as a contempt there must be added to the essential elements of perjury under the general law the further element of obstruction to the court in the performance of its duty. * * *

"Testing the power to make the commitment which is under consideration in this case by the principles thus stated, we are of opinion that the commitment was void for excess of power—a conclusion irresistibly following from the fact that the punishment was imposed for the supposed perjury alone without reference to any circumstance or condition giving to it an obstructive effect."

But, since the court did not hold the witness Wittnebert in contempt finally, the only question before this court is whether or not the subordination of the main suit to the contempt proceedings deprived the appellant of a fair trial. When it was suggested by the proctor for the tug that it would be wiser to defer any contempt proceedings until the conclusion of the trial, the court stated that the contempt proceedings would be continued and the proceedings were heard jointly with the trial of the admiralty cause. The United States attorney's representative was present, having been called by the court. There was no reason or excuse for the contempt charge. If perjury was committed, the duty of the court was plainly to have the witness proceeded against for that criminal offense by indictment.

Thus, before other witnesses were called by the appellant, the court announced his conclusion that he believed the bargee. The bargee was recalled and insisted that he handled the lines of the barge during the shifting operation. After this and before the contempt proceedings were over, the appellant called the master and the deck hand of the tug. They corroborated Wittnebert. The contempt proceedings may have had an effect upon the testimony of the appellant's other witnesses, for it appears that the master when called "thought" the bargee was on board when the lines were shifted but did not know that fact to a certainty. He had no doubt that Wittnebert, not the bargee, made the lines fast. The superintendent of the elevator gave testimony contradicting the claim of a collision. The deck hand Garrett did not "see" the bargee on board, but was sure that Wittnebert attended the lines. At this stage of the case the court dismissed the contempt proceedings, and said that he did so because he was not convinced that Wittnebert testified falsely consciously.

Did this subordination of the main suit to the contempt proceedings deprive the appellant of a fair trial? The necessary factors in a fair trial are an adequate hearing and an impartial tribunal, free from any interest, bias, or prejudice. Tumey v. Ohio, 273 U. S. 510; Ott v. Bd. of Registration in Medicine, 276 Mass. 566, 177 N. E. 542.

The determination to try to punish Wittnebert for contempt, reached upon the theory of false swearing before the appellant had called all its witnesses, was tantamount to accepting the bargee's story, and may well have foreclosed the judge's mind against the defense interposed. If it did, it deprived the appellant of a fair trial.

Moreover, it has been held that, even in the absence of a jury, if another proceeding impedes the principal suit, intimidates the witnesses of one of the parties, or discloses that the court has formed a conclusion on the facts before hearing all the evidence, a fair trial has not been had. Hartenstein v. Bindseil (Sup.) 164 N. Y. S. 102, 103. There the court said:

"There was no jury to be affected by this remark, but it shows that the court decided the case before the proofs were in. Furthermore, such a statement was calculated to have an effect upon the attitude of witnesses during the remainder of the trial that may well have been extremely prejudicial to the rights of the plaintiff, who was thus, to all intents and purposes, prematurely put out of court."

In Hill v. Sullivan, 24 Colo. App. 86, 131 P. 1040, 1041, on the first day of the trial and before the conclusion of the testimony, the court excused the jury, called two of the plaintiff's witnesses before the court, accused them of perjury, and ordered that they be

placed under bond to await action by the district attorney. In reversing and remanding the case, the Court of Appeals said:

"The effect of the judge's severe arraignment of the witnesses, and his placing them under arrest or bond, would naturally tend to overawe any other witnesses which the defendant might have desired later to call, and could have had no other effect than to terrorize the two witnesses in question."

If this case had been tried before a jury or was other than in an admiralty cause, where we may deal with the review as a trial de novo, we might be obliged to grant a new trial, and in so doing it would not be regarded as a departure from the sound practice of not disturbing a finding of fact based upon conflicting evidence. Armour Fertilizer Wks. v. Jacobus-Grauwiller, 26 F.(2d) 775 (C. C. A. 2); Dempsey v. Merritt, Chapman & Scott Corp., 10 F.(2d) 687 (C. C. A. 2). As a rule we must recognize the value of the trial court's conclusion based as it is usually on an observation of the demeanor of witnesses. Donovan v. N. Y. Trap Rock Co., 271 F. 308 (C. C. A. 2). This rule of law places a serious responsibility upon the trial court. The court may accept the word of one witness over the testimony of a number of contradicting witnesses, subject to the limitation that the testimony accepted must be credible. Low Transp. Co. v. Davis, 9 F.(2d) 392 (C. C. A. 2). But, in the exercise of such power and responsibility, the parties must be accorded a fair trial.

■ We can avoid a new trial by reviewing the evidence as a trial de novo on this record and determining the question of fact. We think the fact that the loaded barge remained safely afloat from the time it was moored at Pier 1 (1 p. m. Saturday) until two hours after it was shifted by the tug Meseck on the following Monday morning, when she started to take in water, lends corroboration to the claim of a collision as testified to by the bargee. The barge had visible marks of contact extending down the starboard side abaft amidships. The strake above the bilge log was split and bolts which extend between the strake and the bilge log were bent and the bilge log was split. The swelling of the grain due to the water caused pressure against the sides of the barge. The evidence justifies the claim of appellee O'Donnell that the damage was due to the tug's fault in shifting, and we so find.

It was held below that "the Barnes-Ames Company has failed to exculpate itself as bailee of the 'Reno' to its bailor Taylor, and Taylor, in turn, has failed to exculpate himself to O'Donnell, and the liability, placed first on the 'Madeline Meseck,' must lie secondarily on the bailee nearest to the tug in relationship, and, in the third place only, on Taylor."

■ A decree was entered accordingly. Liability is based upon a finding that a collision due to negligence in navigation by the tug Meseck caused the damage to the barge. Thus it is established that the damage was not caused or due to neglect or fault of either Taylor or the Barnes-Ames Company as charterer or subcharterer. The charterer of a barge under the form of charter in this case is liable only for his negligence [Alpine Forwarding Co. v. Penn. R. R. Co., 60 F.(2d) 734 (C. C. A. 2)], or for the negligence of those to whom he intrusts the craft [White v. Schoonmaker-Connors Co., 265 F. 465 (C. C. A. 3); White v. Upper Hudson Stone Co., 248 F. 893 (C. C. A. 2); The Moran No. 10 (D. C.) 41 F.(2d) 255]. Upon proving the bailment and the return of the barge damaged, the owner of the barge established a prima facie case, and the charterer had the burden of coming forward with proof of no negligence on its part or by any one to whom it had intrusted the barge. The charterer must exculpate himself but that does not mean that he must show how the damage occurred. Cummings v. Penn. R. R. Co., 45 F.(2d) 152 (C. C. A. 2). There is nothing in the record to show that the Barnes-Ames Company or Taylor intrusted the barge to the Meseck, and the damage was due to a collision which in no way is shown to have been the fault or neglect of the Barnes-Ames Company or Taylor. We therefore hold that liability may be imposed upon the Meseck alone.

After the trial, the appellant petitioned to reopen the case so as to offer in evidence a plan of the elevator New York from which it sought to argue that it would be demonstrated that the damage to the Reno could not have been caused in the manner claimed. This petition was denied, without considering the merits, upon the ground that the proctors of the Meseck were guilty of "antecedent procedural inertia" in not taking some steps to have the petition impleading the Meseck amplified before trial and upon the grounds that the petition was "an imposition on a busy court" and not a matter to be presented to an overburdened court. It may be admitted that the court was overburdened in the trial of this case, but that was not suf-

ficient reason for denying consideration to the petition and to the evidence offered. We have examined the petition, as we might on a trial de novo, but do not think it affects the result we have reached.

Costs are allowed to each of the appellees as against the appellant.

Decree modified.

AUGUSTUS N. HAND, Circuit Judge (dissenting in part).

I cannot agree that the barge Reno was under a charter to Barnes-Ames Company made by Taylor acting as agent. O'Donnell sent his bill for the use of the barge to Taylor, and Taylor separately sent his bill to Barnes-Ames Company. Each bill was paid by the party charged. Fols. 575, 576. This indicates that Taylor was a charterer and Barnes-Ames Company a subcharterer as found by the court below. Such being the case, the demise charterer Taylor, under settled authority, remained liable for acts of negligence either of himself or on the part of any person to whom the possession of the barge was intrusted. Gannon v. Consolidated Ice Co. (C. C. A.) 91 F. 539; White v. Upper Hudson Stone Co. (C. C. A.) 248 F. 893.

It is true that damage done to the barge through the negligent acts of a third party to whom the barge was not intrusted by the charterer or subcharterer would not render either Taylor or Barnes-Ames Company liable. But the shifting tug at Hoboken was not such a third party. It must have been within the contemplation of Barnes-Ames Company that the barge, when left in the slip, would have to be moved to the elevator in order to load the cargo upon the steamer to which it was destined. No other way of moving the barge was provided than by the use of the shifting tug Meseck, and the reasonable conclusion seems to be that the Barnes-Ames Company allowed the Meseck to shift the barge and intrusted her to its care. In my opinion, these circumstances bring the case directly within the authorities holding a demise charterer liable for the negligent acts of any one to whom it intrusts the possession of the chartered vessel. The subcharterer is in a similar situation. Both charterer and subcharterer are liable to the owner of the barge in the order fixed by the trial court for the negligent acts of the Meseck to whom the primary liability attached. I accordingly am of the opinion that the decrees below should be in all respects affirmed.